UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 93-1052
_____

JAN FORSYTH, ET AL.,

Plaintiffs-Appellants,

versus

JOHN HOLMAN BARR, ET AL.,

Defendants,

MACK VINES, DWIGHT WALKER,
WILLARD ROLLINS,

Defendants-Appellees,

versus

CITY OF DALLAS, TEXAS,

Defendant-Appellee-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Texas
_____

(April 20, 1994)

Before WISDOM, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

BARKSDALE, Circuit Judge:

At issue is a summary judgment awarded the appellees (City of Dallas and three of its police officers) on the appellants' claims under the Federal Wiretap Act, 18 U.S.C. §§ 2510-2520: (1) for interception by a third person (appellants claim conspiracy) of the appellants' telephone conversations, when two of the appellants were police officers involved in an undercover operation; and (2) for the appellees' disclosure and use of the contents of those

intercepted conversations for a police internal affairs investigation, conducted after that information was conveyed to the police as part of the bases for charges against one of the appellants (an officer).

The appellees deny that they were involved in the interception of the communications, but they did disclose and use the information in their investigation. In the final analysis, the summary judgment hinges on whether the disclosure and use were permitted by the Act, it being undisputed that they were "appropriate to the proper performance of the [appellee officers'] official duties", as provided for in § 2517(1) and (2). The linchpin to that question, assuming that the third person illegally intercepted the information, is whether the appellee officers' "obtain[ing]" that information from that person was "by any means authorized by" the Act, as found in § 2517(1) and (2). The meaning of this phrase is far from clear; but the legislative history sanctioning such disclosure and use of illegally intercepted information is crystal clear.

The persons whose conversations were intercepted -- Jan Forsyth and Richard Kirks (the officers), and Susan and Charles Bruton (the latter being an informant) -- appeal from the judgment for the City, Dwight Walker, Willard Rollins, and Mack Vines. The City appeals being required to provide independent counsel for Vines. We **AFFIRM**.

I.

Dallas police officers Forsyth and Kirks, two of the four appellants, were assigned to the Intelligence Division. In December 1987, under the supervision of appellee Rollins of that division, they began an undercover investigation, with appellant Charles Bruton acting as an informant. His wife, appellant Susan Bruton, had been an informant previously for Forsyth. The investigation was conducted, in part, from the Brutons' home in Dallas, including over their telephone.

While the undercover investigation was ongoing, appellant Forsyth was telephoned in March 1988 by John Barr, a Dallas attorney,[1] about an unrelated civil case involving appellant Charles Bruton (the informant) and Barr's client, George Grogan.[2] The appellants alleged in their complaint that Grogan had hired Bruton to illegally dispose of toxic chemicals; that he had reported the illegal disposal, causing state environmental authorities to initiate an investigation of Grogan; that Barr sought Forsyth's assistance in having Bruton recant his illegal disposal charges; and that Forsyth refused to become involved.

The appellants further alleged in their complaint that, in June 1988, Barr and Grogan contacted the Dulworths, neighbors of

---

[1]   Barr, who described himself as a "cop groupie", occasionally accompanied Dallas police officers in the execution of warrants.

[2]   Grogan, a businessman and former member of the Dallas Planning and Zoning Commission, owned property next to the Brutons' home.

both Grogan and the Brutons,[3] and asked for their assistance either in discrediting Charles Bruton, Forsyth, and Kirks, or in finding a way to force Bruton to recant his waste disposal charges; that the Dulworths held a grudge against Bruton because he had testified in a criminal trial against Gary Dulworth; that the Dulworths arranged to route the Brutons' telephone line into a previously dormant line at the Dulworths' home, so that, on an extension in their home, the Dulworths could listen to the Brutons' telephone conversations; and that Barr, Grogan, and the Dulworths monitored and recorded the Brutons' calls, in violation of the Wiretap Act.

On September 22, 1988, Grogan, Barr, and one of Barr's law partners met with appellee Walker, who was in charge of the police Internal Affairs Division, and charged that Forsyth had engaged in criminal and administrative misconduct during the undercover investigation.[4] Walker was told that, over one of her telephones, Mrs. Dulworth had overheard conversations between Charles Bruton and Forsyth; that Mrs. Dulworth thought that the telephone had been disconnected, but that it had suddenly become operable; and that she had told Grogan that she believed that her telephone line had become crossed with the Brutons'. Barr told Walker that a wiretap was not involved, and Walker believed that the telephone had become a party line accidentally.

---

[3] Homer and Joyce Dulworth, and their son, Gary, resided across the street from the Brutons.

[4] The appellants alleged that Barr used the illegally intercepted conversations to punish Forsyth and Kirks for not cooperating with him regarding Charles Bruton and Grogan's toxic waste disposal.

At the meeting, Barr made very serious charges against Forsyth and the Brutons.[5] At the conclusion of the meeting, Walker was not certain which charges arose out of the telephone eavesdropping and which came from other sources. At least some of the information was obtained by Barr, his law partner, and Grogan from sources other than the intercepted conversations. Walker assumed that information about a personal trip by Forsyth and Charles Bruton was overheard. *See* note 5, *supra*. The information about Charles Bruton participating in a drug deal was overheard also. *See* note 5.

---

[5] On September 22, Barr submitted an affidavit summarizing his charges against Forsyth. Also at the meeting that same day, Barr told Walker that he and Grogan believed that Forsyth was making arrangements for the dismissal of environmental fines of approximately $30,000 against Charles Bruton; that Bruton and Forsyth were involved in a personal relationship and possibly had taken a trip to Tennessee together; that Forsyth possibly had covered up, or arranged for charges to be dropped regarding, a murder-for-hire scheme in which Charles and Susan Bruton tried to kill her ex-husband; that Forsyth had misrepresented to a state judge the nature of Charles Bruton's work as an informant for her; that Charles Bruton was to receive "half the dope" in a narcotics deal; and that Forsyth knew that Charles Bruton had convinced a Darrell Smallwood to burglarize Grogan's house, but had failed to see that charges were filed against either of them. As to the burglary, Barr told Walker that he learned about it from visiting Smallwood in jail.

Walker was also informed that Grogan had understood from prior conversations with Mrs. Dulworth that the City had made a deal with Charles Bruton to allow him to illegally mine Grogan's property; and that Mrs. Dulworth had told Grogan that she overheard on her telephone: that some environmental matters needed handling, that Charles Bruton was calling for "Jan" (Forsyth) and that Jan was the only one who could control Bruton, that there were dead bodies and dead dogs on the property (unclear whether Grogan's or Brutons'), and that Charles Bruton was being protected by Dallas police officers.

Walker decided to conduct a preliminary internal affairs investigation of the charges. Such investigations are conducted to ensure the integrity of the police department. They are not considered formal complaints; and, unless a violation is identified, they are not reflected in the personnel record of the investigated employee.

On either September 22 or 23, Walker informed appellee Rollins (the supervisor of Forsyth and Kirks' undercover investigation) about the meeting with Barr and the charges against Forsyth. In turn, on either September 22 or 23, Rollins informed Lieutenant Lybrand (one of Forsyth and Kirks' supervisors) about the charges. Lybrand advised Rollins that the police department should investigate whether a wiretap was in place; Rollins responded that any investigation should be performed by the FBI.

With Lybrand present, Rollins met on September 23 with Kirks and Forsyth, informed Forsyth that a complaint had been filed against her, and instructed them not to discuss police business over the Brutons' telephone or to tell anyone that he had given them that order. Kirks and Forsyth left the meeting believing that there was a "legal wiretap" on the Brutons' line, although neither Rollins nor Lybrand told them anything about a wiretap. They interpreted Rollins' instructions as permitting non-business discussions, and continued to have conversations on the line after September 23.[6] Rollins assumed that business was the extent of the

_____

[6]     Kirks' deposition testimony is inconsistent on whether he and Forsyth followed Rollins' instructions not to discuss police business on the line. Although Kirks initially testified that they

- 6 -

relationship between the Brutons and Kirks and Forsyth,[7] and did not anticipate that the officers would continue to use the Brutons' telephone.

Shortly after the September 22 meeting with Walker, Grogan contacted City Manager Richard Knight about the matter, because Mrs. Dulworth had advised Grogan that she had overheard another telephone conversation in which Charles Bruton had said that the telephone line was "hot". Grogan concluded that Walker had disclosed to Forsyth and Kirks the information received from Barr and him (Grogan). At Knight's request, appellee Vines, the Chief of Police, met with Grogan. Vines was kept apprised of the progress of the internal affairs investigation.

On September 26, Walker gave his notes from the September 22 meeting to Detective Jennings of the Internal Affairs Division, and described that meeting and the charges against Forsyth. In conducting the preliminary investigation, the appellees used the information received on September 22 from Grogan, Barr, and his partner, including the information obtained from intercepted conversations and that obtained from other sources.

---

had complied with the order, he later testified that not all of the calls made after Rollins gave the order were personal.

[7] In support of their motion for summary judgment, the appellees submitted a copy of the procedures for dealing with informants, including the following: "The relationship between an officer and an informant should always be strictly professional".

- 7 -

Jennings interviewed Barr on October 3, regarding the condition of the Dulworths' telephone and the charges.[8] That same day, after interviewing Barr, Jennings contacted Southwestern Bell Telephone Company and requested a check on the Dulworths' telephone line. In response, a Southwestern Bell employee went to the Dulworths' home the next day, October 4. With Charles Bruton present, the employee located and disconnected a spliced wire connecting the Dulworths' and Brutons' lines. Bruton told the employee that he knew that the Dulworths had been "wiretapping" or "listening in" on his telephone.[9] The employee removed the connectors and gave them to Charles Bruton, who turned them over to Kirks. Later, Jennings gave them to the FBI.

Upon completing the internal affairs report, Jennings forwarded it to the chain of command on November 2, 1988. The investigation resulted in charges against Forsyth being classified as "unfounded".

Forsyth and Kirks filed suit against Barr, Grogan, the Dulworths, the City, Vines, Rollins, and Walker in February 1989. They alleged that the Dulworths "entered into an illegal agreement with BARR and GROGAN to illegally intercept and/or record and/or illegally use information from telephone conversations" between

---

[8] Jennings did not interview Barr earlier because of the illness and death of Barr's father.

[9] Charles Bruton stated by affidavit that a Bobby Woods told him "in late September" that his (Bruton's) telephone was tapped by the Dulworths or that they were listening to conversations. Forsyth stated by affidavit that, on September 25, 1988, Woods told Bruton about the eavesdropping.

Charles Bruton and Forsyth and Kirks; and that Vines, Rollins, and Walker, on behalf of the City, "knowingly accepted and used information illegally intercepted from [such] telephone conversations".  In August 1989, the action was consolidated with a similar case filed by Charles and Susan Bruton.[10]

In April 1991, the appellees (City, Walker, Vines, and Rollins) moved for summary judgment; and the district court granted summary judgment that November, later denying a motion for reconsideration.  The appellants settled their claims against Barr, Grogan, and the Dulworths; those claims were dismissed in November 1992.

## II.

The standards for a summary judgment and our plenary review of it are well established and should be well known.  *E.g., LeJeune v. Shell Oil Co.*, 950 F.2d 267, 268 (5th Cir. 1992).  But, because of the factually driven interception claim in this case, and the appellants' failure to comply in some instances with the procedure for showing a material fact issue for that claim, they bear repeating in some detail.

We employ the same criteria as the district court, viewing all facts, and the inferences to be drawn from them, in the light most favorable to the non-movants.  *Id.* at 268.  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

---

[10]    Southwestern Bell was named as a defendant in the Brutons' original complaint, and in Forsyth and Kirks' first amended complaint.  On the appellants' motion, Southwestern Bell was dismissed.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] dispute about a material fact is `genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party". *Id*. at 248; *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant has the initial burden of demonstrating the absence of a material fact issue. *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 279-80 & n.6 (5th Cir. 1991). If it satisfies that burden, the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Needless to say, unsubstantiated assertions are not competent summary judgment evidence. *Id.* at 324. "Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, ... if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993).

As the basis for civil recovery, the appellants claimed violations of Title III of the Omnibus Crime Control and Safe

Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2510-2520 (the Act), alleging the intentional interception, disclosure, and use of wire communications.[11]  (The Act frequently makes reference to "this chapter"; for purposes of this opinion, it is found in Chapter 119 of 18 U.S.C.)  The district court granted summary judgment on the grounds that (1) there was no evidence that the appellees had intercepted the conversations; and (2) the appellees did not violate the Act either by disclosing to other officials, for purposes of the internal affairs investigation, information obtained from an illegal wiretap, § 2517(1), or by using that information in the investigation, § 2517(2).[12]

"[The Act] has as its dual purpose (1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception

---

[11]    Section 2520, which authorizes civil recovery for violations of the Act, states in pertinent part:

> [A]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a).

[12]    The district court did not base its ruling on the individual appellees' qualified immunity claim.  Of course, even if we were to conclude that the reasons given by the district court do not support summary judgment, we may affirm it on any other grounds supported by the record.  *E.g.*, **Chevron U.S.A., Inc. v. Traillour Oil Co.**, 987 F.2d 1138, 1146 (5th Cir. 1993).  In any event, as discussed *infra*, we affirm on grounds relied upon by the district court.

of wire and oral communications may be authorized." *Gelbard v. United States*, 408 U.S. 41, 48 (1972) (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2153).

> [The Act] authorizes the interception of private wire and oral communications, but only when law enforcement officials are investigating specified serious crimes and receive prior judicial approval, an approval that may not be given except upon compliance with stringent conditions .... Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes, ... and the victim of such interception, disclosure, or use is entitled to recover civil damages .... [The Act] also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions, ... and provides procedures for moving to suppress such evidence in various proceedings ....

*Id.* at 46. "[A]lthough [the Act] authorizes invasions of individual privacy under certain circumstances, the protection of privacy was an overriding congressional concern". *Id*. at 48. "The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression." *United States v. United States District Court*, 407 U.S. 297, 301-02 (1972).

A.

Except as authorized, the Act prohibits the intentional interception of wire communications.[13]  "A telephone conversation

---

[13]    The Act provides, in relevant part:

> (1) Except as otherwise specifically provided in this chapter[,] any person who --
>
> > (a)    intentionally intercepts, endeavors to intercept, or procures any

is a wire communication." ***Briggs v. American Air Filter Co., Inc.***, 630 F.2d 414, 417 (5th Cir. 1980).[14] "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device". 18 U.S.C. § 2510(4). And, "the wording of the statute, while broad, requires that interceptions be intentional before liability attaches, thereby excluding inadvertent interceptions". ***Thompson v. Dulaney***, 970 F.2d 744, 748 (10th Cir. 1992).[15] An "interception" "require[s] participation by

---

> other person to intercept or endeavor to intercept, any wire, oral, or electronic communication ...

> shall be subject to suit ....

18 U.S.C. § 2511(1)(a). As noted, "this chapter", as used in the foregoing section, refers to the Act.

[14] "Wire communications, unlike oral communications, are protected against interception by electronic, mechanical, and other devices regardless of the speaker's expectation of privacy". ***Briggs***, 630 F.2d at 417 n.4.

[15] In ***United States v. Savage***, 564 F.2d 728 (5th Cir. 1977), our court, addressing a situation in which a motel switchboard operator stayed on the telephone line and overheard a suspicious conversation, stated:

> We find no evidence that Congress in passing [the Act] ... intended such conduct to be unlawful .... This is not the case of an illegal wiretap by the Government or the case of a malicious violation of one person's privacy by another through intentional eavesdropping. It is the simple case of a motel switchboard operator who inadvertently heard a suspicious conversation in the course of her employment and in good faith told a policeman what she had heard. The telephone conversation was therefore admissible as evidence [in the criminal prosecution].

***Id***. at 732.

the one charged with an `interception' in the contemporaneous acquisition of the communication through the use of the device." *United States v. Turk*, 526 F.2d 654, 658 (5th Cir.), *cert. denied*, 429 U.S. 823 (1976).[16] "[N]o new and distinct interception occurs when the contents of a communication are revealed through the replaying of a previous recording." *Id*. at 659.

Appellants conceded at oral argument that the appellees did not install any device or listen to any conversations; nor is there any evidence either that the appellees actually participated in causing the lines to be wired so that the Dulworths could intercept the conversations, or that, prior to the September 22 meeting between Barr, Grogan, and appellee Walker, the appellees had any knowledge that the Dulworths were able to do so. Nevertheless, the appellants assert that the appellees are liable for intercepting those conversations. As factual support for this claim, they rely in large part on the fact that the appellees, after learning about the Dulworths' ability to intercept, allowed the situation to continue for almost two weeks before having a possible wiretap

---

Similarly, in *United States v. Campagnuolo*, 592 F.2d 852 (5th Cir. 1979), an FBI agent reconnected an unplugged telephone during the execution of a search warrant and received 42 calls. Our court held that this did not violate the Act, despite the fact that the FBI never obtained judicial authorization for the challenged activity: "Even if we assume that these actions constituted an `interception' under [the Act], it is clear that they did not violate that statutory scheme." *Id*. at 862.

[16] On summary judgment, the non-movant "can raise a question of fact regarding ... actual interception of his conversations without proving the contents of specific conversations allegedly intercepted". *Walker v. Darby*, 911 F.2d 1573, 1578 (11th Cir. 1990).

- 14 -

investigated. They also claim a conspiracy, maintaining that the appellees are therefore liable for the alleged illegal interception, even if they did not participate in it.

In support of their summary judgment motion, the appellees submitted considerable evidence that, after the September 22 meeting, no City employee, including appellees Walker, Rollins, or Vines, procured anyone to monitor the calls. This evidence included Joyce Dulworth's deposition testimony that she did not have an agreement with the City or any police officers to furnish them information that she intercepted; that Jennings did not ask her to notify him if she intercepted anything else; and that no one told her to listen to future calls. Likewise, in their affidavits, Walker and Rollins stated that they did not have an agreement with anyone that the contents of intercepted conversations would be reported to them or anyone else.

The appellees also submitted evidence pointing out the weaknesses in the evidence supporting the appellants' interception claims, including Forsyth's, Kirks', and Susan Bruton's deposition testimony, which reflects only conclusory, unsubstantiated claims that the appellees arranged to receive additional information after the September 22 meeting,[17] and Kirks' and Forsyth's interrogatory

_____

[17]    Forsyth testified:

> Q: Do you have any knowledge, either firsthand or hearsay knowledge, that the police department made some kind of arrangement with anyone to continue to receive information from Mrs. Dul[]worth or any of the Dul[]worths after September 22nd, 1988?

- 15 -

A: By leaving the telephone tap in place, which allowed the Dul[]worths to continue to monitor conversations and to continue to get back to Grogan and continue to get back to John Barr, who returned to the police department with more information off the telephone, yes.

Q: I'm asking you if you have any evidence or any information about an affirmative agreement between the Dallas Police Department and anyone else that they would give further information to the Dallas Police Department?

A: Other than the fact that John Barr told the Internal Affairs Division that he didn't want the Dul[]worths bothered in so many words; that he had more information that he had, based on hearsay; and he was planning to come back with more information. The telephone remained unsecure. They did not call Southwestern Bell. They allowed the telephone to remain in place. All those indicate to me that they had an agreement.

Kirks testified:

A. I think it is a matter of record of what Jagg[]i [an assistant City Attorney] told them. He says it is a wiretap. Get away from it.

....

And if he is telling them it is a wiretap and to get away from it and they don't get away from it, they do continue to monitor, then in all likelihood they are going to come back and try to cover their butts and lie, and they did lie, and they are still lying today. That's speculation, but I am sure going to court with it.

Q. So it is your contention that Louis Jagg[]i told them not to monitor the phones and they did it anyway?

A. Absolutely.

....

They are monitoring it. They are also intercepting it, even though they are procuring another person to do it.

- 16 -

answers.  When asked what actions by Vines, Rollins, and Walker violated the Act, they responded that each "illegally *used* information obtained from an illegal telephone interception"; illegal interception *by the appellees* was not claimed.  (Emphasis added.)  Another interrogatory asked the appellants to state the factual basis for their assertion that Walker, Rollins, and Vines prearranged to receive illegally intercepted information.  In essence, they responded that the appellees, *after* being made aware on September 22 of the interception, continued to receive information from intercepted conversations, and failed to take steps to have the tap removed until October 4.[18]

---

>    Q.    Whom did they procure to do it for them?
>
>    A.    I don't know.  John Barr and George Grogan are the one[s] that brought it up to the I.A.D. [Internal Affairs Division] complaint.
>
>    Q.    So you think they had an arrangement with John Barr and George Grogan that they were supposed to keep them posted or go out there and gather more information?
>
>    A.    Certainly.  Why else would they leave it in place? ....

(Claiming the attorney-client privilege, the City consistently objected to the appellants' attempts to testify about advice allegedly given to Walker and Rollins by attorneys with the City Attorney's Office.)

    Susan Bruton testified:

>    Q.    Specifically, what is it in this case that the City of Dallas did which acted in furtherance of the unlawful telephone activities?
>
>    A.    They permitted the wiretap to continue.

[18]    Forsyth and Kirks responded to the interrogatory as follows:

1.

With their response to the summary judgment motion, the appellants filed two volumes of evidentiary material, tabbed "A" through "VV", but referred specifically to only four items: Tab "A", the 177-page internal affairs investigation report and attachments (without pointing to any specific portions of this document); and Tabs "B", "C", and "E" -- the individual appellees' interrogatory answers regarding the basis for their good faith

On September 22, 1988[,] the police officials were made aware of the telephone conversations that were illegally intercepted, used and disclosed. Because the illegally intercepted telephone conversations involved two of their employees, they attempted to continue to monitor these conversations by seeking advice from [the] City Attorney's Office. When they realized the illegality of the situation they not only failed to check for a device which enabled these conversations to be illegally intercepted by a known target who was in the Targeted Offender Program in the Intelligence Division, but they also continued to receive information provided by the Targeted Offender's family as they continued to listen in to more illegally intercepted telephone conversations. When Detective Jennings sent Southwestern Bell to the location to check for a device enabling these illegally intercepted telephone conversations on October 4, 1988[,] a device was in fact removed. When the police officials learned that Southwestern Bell had in fact removed a device they became very upset that this was done without their approval. The aforementioned circumstances could hardly be characterized as "inadvertent".

Susan and Charles Bruton responded to this same interrogatory as follows:

Do not understand question. The information is in Dallas Police Department I.A.D. file and depositions of Lt. Jennings and John James indicated that these defendants had knowledge and did nothing to correct the situation.

- 18 -

defenses. These specific references were cited in opposition to the individual appellees' qualified immunity claim.

When the movant has made a properly supported motion for summary judgment by demonstrating an absence of evidence to support the non-movants' case, as the appellees did, the non-movants must "go beyond the pleadings and by ... affidavits, or by the `depositions, answers to interrogatories, and admissions on file,' designate `*specific facts showing that there is a genuine issue for trial*'." **Celotex Corp. v. Catrett**, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added); *see also* **Skotak v. Tenneco Resins, Inc.**, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 98 (1992).

Accordingly, the appellants had the burden of presenting evidence sufficient to demonstrate the existence of a material fact issue on whether the appellees intentionally intercepted their conversations. *See*, *e.g.*, **Anderson v. Liberty Lobby, Inc.**, 477 U.S. at 257. To satisfy this burden, they were required to identify specific evidence in the record, and to articulate the "precise manner" in which that evidence supported their claim. **Topalian v. Ehrman**, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, ___ U.S. ___, 113 S. Ct. 82 (1992); *see also* **Krim v. BancTexas Group, Inc.**, 989 F.2d at 1443.

They did not do so. Instead, they offered only vague, conclusory assertions that their "evidentiary materials ... demonstrate circumstantial evidence of a conspiracy and/or joint action on the part of Vines, Walker, Rollins, and the City"; that

- 19 -

"there is clear evidence that the aim of the conspiracy was to use information from illegally intercepted telephone conversations presented to these Defendants by Barr, Grogan and the Dulworths"; and that "there is abundant evidence, both circumstantial and direct, that would allow a jury to find that the City and its employee Defendants worked together to accomplish and cause an[] illegal wiretap to remain in place and thereafter use information obtained from an illegal wiretap in violation of ... [the Act]". But, although they submitted two volumes of evidentiary material, they did not identify the specific portions of such evidence (if any) that supported their illegal interception claim. The appellants' response and supporting evidence are insufficient to preclude summary judgment. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment". *Skotak*, 953 F.2d at 915 & n.7.

Nor is it our duty to do so on appeal. The appellants' opening brief contains similar conclusory assertions that they presented direct and circumstantial evidence that the appellees conspired with Barr, Grogan, and the Dulworths. But, contrary to Fed. R. App. P. 28(a)(5), they furnished no record cites to such evidence. In their reply brief, for the first time, they attempt to designate specific portions of the record to support their opposition to summary judgment. This attempt comes far too late -- obviously, it should have been done in the district court. *See, e.g., Topalian*, 954 F.2d at 1131-32 n.10; *cf. United States v.*

*Prince*, 868 F.2d 1379, 1386 (5th Cir.) ("This Court will not consider a new claim raised for the first time in an appellate reply brief".), *cert. denied*, 493 U.S. 932 (1989).

2.

But, even if we were to consider the evidentiary material designated for the first time in the reply brief, we would still affirm summary judgment on the interception claim. That evidence, viewed in the light most favorable to the appellants, establishes only that the appellees (1) knew that some of the information related to Walker at the September 22 meeting was obtained from telephone conversations overheard by Mrs. Dulworth, and (2) failed to investigate promptly a possible wiretap.

This notwithstanding, relying on *Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970), the appellants maintain that the appellees did not satisfy their initial burden under Rule 56 because they "failed [to] produce evidence which would completely nullify any inference of a conspiracy". This reliance is misplaced because, unlike the plaintiff in *Adickes*, the appellants did not plead conspiracy. *See id*. at 148. Therefore, the appellees, as part of their summary judgment burden, were not required to demonstrate the absence of a material fact issue as to conspiracy. Nevertheless, as described above, they submitted considerable evidence negating its existence. And, as also described earlier, this evidence was not refuted by the appellants in a manner sufficient to satisfy Rule 56.

In light of the appellants' scant proof, a reasonable jury could not return a verdict for them (non-movants) on the claim that

the appellees intentionally intercepted, endeavored to intercept, or procured anyone to intercept, the conversations; therefore, there was not a material fact issue on this claim.[19]  Accordingly, summary judgment on the interception claim is proper.

B.

With certain exceptions, § 2511(1)(c) and (d) of the Act prohibit the intentional disclosure or use of information obtained through a wire intercept if the person doing so "knew or had reason to know that the interception itself was in violation of [the Act]".  *United States v. Wuliger*, 981 F.2d 1497, 1501 (6th Cir. 1992).[20]  Liability for disclosure or use requires proof that it was

_____

[19]   We note that some of that evidence is challenged by the appellees as inadmissible hearsay or, again, as being based on matters within the scope of the attorney-client privilege.  We need not reach those contentions; even considering the challenged evidence, a material fact issue is lacking.

[20]   The Act provides in pertinent part:

> (1) Except as otherwise specifically provided in this chapter any person who --
>
> ....
>
> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or
>
> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or

- 22 -

intentional, that the information was obtained from an intercepted communication, and that the defendant knew or should have known that the interception was illegal.[21]  Accordingly, "knowledge or

_____

> electronic communication in violation of this subsection;

shall be punished ... or shall be subject to suit ....

18 U.S.C. § 2511(1)(c) and (d).

[21]  Liability for *intercepting* or procuring another to intercept communications under subsections (a) and (b) of § 2511(1) requires that a plaintiff prove intentional conduct.  However, liability under subsections (c) and (d) of § 2511(1) for *use and disclosure* of information obtained from the contents of intercepted communications requires more.  The use or disclosure must still be intentional, but in addition, a plaintiff must show that a defendant "know[s] or ha[s] reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."  This language, found in each of subsections (c) and (d), compels the conclusion that, to establish liability under one of those sections, a plaintiff must demonstrate a greater degree of knowledge on the part of a defendant.  The defendant must know 1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of [the Act].

Although a defendant may be presumed to know the law, ... to establish use and disclosure liability under [the Act], a defendant must be shown to have been aware of the factual circumstances that would violate the statute.  For example, it is not enough to show that a defendant merely knew he was using or disclosing information from an intercepted communication.  It must also be shown that the defendant knew, *inter alia*, that neither party to the intercepted conversation had consented to the interception.

- 23 -

reason to know of the illegality is an element of this offense".
*Id*.

Although there is a factual dispute as to when or whether the appellees knew, or should have known, that the communications might have been intercepted illegally, it is undisputed that, in connection with conducting the preliminary internal affairs investigation, and without investigating the legality of the interception, the appellees (1) disclosed the contents of intercepted communications to other law enforcement officers; and (2) used those contents -- to the extent that the charges against Forsyth were based on the communications.[22]  We assume an illegal interception.[23]  Civil liability for such disclosure and use, in such an investigation, of information derived from an illegal interception, when the information was obtained from a third party interceptor without wrongdoing by the officers, appears to be an issue of first impression.

The appellees maintain that the summary judgment on the disclosure and use claim can be affirmed on two separate bases: (1) the interception was impliedly consented to by the appellants, each of whom used the Brutons' telephone with awareness that it was not

---

*Thompson v. Dulaney*, 970 F.2d at 749 (emphasis in original; citations omitted).

[22]  It is not clear from the record whether some, or all, of the contents were disclosed and used.  Because we view the evidence in the light most favorable to the non-movants, we assume the latter.

[23]  Because of possible defenses, such as consent, *see* § 2511(2)(c), (d), we do not reach whether the interception by either the Dulworths, or Barr, or Grogan was illegal.  As noted, the appellants settled with each.

- 24 -

secure; and (2) the disclosure and use was authorized by the Act, § 2517(1) and (2).  In addition, the individual appellees (Vines, Walker, and Rollins) claim qualified immunity, asserting that there was no clearly established law that an internal investigation of a police officer, based upon information presented to her superiors that was overheard by a third party, violates the Act.  And, the City maintains that the Act does not permit municipal liability. *See* 18 U.S.C. § 2520(a) (Supp. 1993).  Because we hold that the disclosure and use were permitted by § 2517(1) and (2), we need not reach the other issues.[24]

1.

At the outset, we reject the appellants' contention that illegally intercepted information cannot be used for any purpose whatsoever.  In support, they rely on § 2515, which provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the

---

[24] As discussed *infra*, whether the Act proscribes the disclosure and use is a difficult issue.  This militates in favor of reaching the qualified immunity claim instead.  But, even if the individual defendants/appellees were sheltered by such immunity, the liability *vel non* of the City would remain; and that issue calls into play a statutory construction question that is perhaps as difficult, if not more so, than that for disclosure and use.  *See, e.g.*, 18 U.S.C. §§ 2510(6), 2511(1), 2520(a) (amended in 1986 to include any "entity" as a party from which civil recovery is permitted); **Bodunde v. Parizek**, 1993 WL 189941 (N.D. Ill. 1993); **PBA Local No. 38 v. Woodbridge Police Department**, 832 F. Supp. 808 (D.N.J. 1993); **Amati v. City of Woodstock, IL**, 829 F. Supp. 998 (N.D. Ill. 1993).  For this reason, and because addressing whether disclosure and use is statutorily permitted pertains to all of the defendants/appellees, we address that issue.

United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

18 U.S.C. § 2515.[25]

Section 2515 is "the statutory exclusionary rule". *Fleming v. United States*, 547 F.2d 872, 873 (5th Cir.), *cert. denied*, 434 U.S. 831 (1977); *see also* *United States v. Wuliger*, 981 F.2d at 1505 (same); *United States v. Cianfrani*, 573 F.2d 835, 855 (3d Cir. 1978) (same); *United States v. Phillips*, 540 F.2d 319, 325 (8th Cir.) (§ 2515 "imposes an evidentiary sanction to compel compliance with § 2511"), *cert. denied*, 429 U.S. 1000 (1976). It "serves not only to protect the privacy of communications, but also to ensure that the courts do not become partners to illegal conduct: the evidentiary prohibition was enacted also `to protect the integrity

---

[25] Our court has described § 2515 as "poorly drafted":

> Read literally, the provision is circular; it proscribes the reception into evidence (and thus the disclosure) of information the disclosure of which "would be in violation of this chapter." "Disclosure" apparently refers to disclosure at trial rather than disclosure among various departments of the government at some earlier point; otherwise, the statute would presumably refer to information the disclosure of which "has been" in violation of the chapter. At any rate, the provision should not be read in an overly literal fashion. The section's primary purpose is apparently to exclude evidence derived from illegal, rather than legal, wiretaps. The section's main thrust is therefore to exclude evidence the *seizure* of which was in violation of the chapter, not evidence the *disclosure* of which was or would be in violation of the chapter.

*Fleming v. United States*, 547 F.2d 872, 874 (5th Cir.), *cert. denied*, 434 U.S. 831 (1977).

of court and administrative proceedings'". *Gelbard*, 408 U.S. at 51 (footnote omitted).

Section 2515 is not applicable. The intercepted information was used only in the sense that it was investigated because it was the basis for some of the charges against a police officer. The information was not offered or introduced into evidence at any trial, hearing, or proceeding, but was instead the subject of an investigation. The Dallas Police Department General Orders Code of Conduct (1988), submitted by the appellees in support of their summary judgment motion, provides for complaint investigations to be classified as either "formal, preliminary, or summary (informal)". As noted, preliminary investigations, such as the one at issue, do "not reflect on the personnel record of any member involved unless a violation is identified, in which case a formal complaint will be authorized by the Internal Affairs Division Commander". The investigation was conducted through telephone and personal interviews and written reports; there was no hearing or other proceeding in which evidence was introduced.

We agree with the Court of Appeals for the District of Columbia that "[t]he statutory context ... in which `proceeding' appears in company with `trial' and `hearing,' suggests something similarly adversarial -- not an *ex parte* administrative determination of the sort here at issue [a non-responsibility determination made by an Air Force contracting officer]". *Cubic Corp. v. Cheney*, 914 F.2d 1501, 1504 (D.C. Cir. 1990). The title of § 2515 -- "Prohibition of use *as evidence* of intercepted wire or

oral communications" (emphasis added) -- clearly supports that interpretation.  As the **Cubic Corp.** court noted, § 2515 also contains "an express reference to the powers of `the judge' before whom the `motion to suppress' is to be made ....  The more sensible reading is that the statute applies only to an adversarial proceeding, like a trial or other hearing, before a `judge.'" **Id**. at 1504.  That reasoning applies with equal force here.  A preliminary internal affairs investigation is not a realistic forum in which to move to suppress the wiretap information, because it does not include any sort of "hearing" at which a judge presides.[26]

The **Cubic** court pointed out that the legality of the use of intercepted information could be challenged "when a court reviews an administrative decision on a record that allegedly contains unlawfully intercepted wiretap information", by moving to suppress

---

[26]    The **Cubic** court stated:

> As a practical matter, ... an *ex parte* administrative determination is not a realistic forum in which to raise a Title III claim.  The party to which the wiretap information applies would have to be given an opportunity to make something like a `motion to suppress' the information before the agency could consider it, a hearing would have to be convened, and a ... judge brought in to preside.  Meanwhile, the agency could not make a decision, or at least not a decision adverse to the subject of the wiretap information. All this seems like a most improbable way of doing business, and until the agency actually makes an adverse decision based upon the wiretap information, an unnecessary complication, too. Without clearer congressional direction to that effect, we are reluctant to conclude that [the Act] was meant to be so disruptive a force in the administrative process.

914 F.2d  at 1504.

under § 2518.  *Id*. at 1506.[27]  Similarly, if the internal affairs investigation had identified a violation and a formal complaint had been filed, resulting in an adverse determination, Forsyth and Kirks would have been free to challenge in court the Internal Affairs Division's reliance on information derived from the wiretap.

Moreover, even in the context of an adversarial proceeding to which § 2515 applies, that section does not preclude *all* use of illegally intercepted information.  For example, in **United States v. Caron**, 474 F.2d 506, 508-10 (5th Cir. 1973), our court held that unlawfully intercepted information may be used for impeachment. Three other circuits also have recognized this impeachment exception in criminal cases.  **United States v. Echavarria-Olarte**, 904 F.2d 1391 (9th Cir. 1990); **United States v. Vest**, 813 F.2d 477, 484 (1st Cir. 1987) (recognizing impeachment exception, but declining "to read into [§] 2515 an exception permitting the use of

---

[27]    The **Cubic** court noted:

> Our decision does not preclude the Air Force from considering untested wiretap information in making a non-responsibility determination, without thereby creating a right in anyone to challenge the provenance of that information.  If the agency's decision is challenged in a subsequent judicial proceeding, however, an aggrieved person has the same right to move to suppress the information as that person would have if the agency were formally moving the admission of the information in evidence before the court.  In other words, if an agency relies upon wiretap evidence in rendering a reviewable decision, it must be prepared to defend in court the legality, under [the Act], of the wiretap that produced it.

*Id*. at 1506.

illegally-intercepted communications in perjury prosecutions");

*Anthony v. United States*, 667 F.2d 870 (10th Cir. 1981), *cert. denied*, 457 U.S. 1133 (1982).[28]

Finally, § 2515 is not self-executing, but is instead dependent upon a motion to suppress, pursuant to § 2518(10)(a) (any aggrieved person may move to suppress the contents of any unlawfully intercepted communication). That section "provides the remedy for the right created by [§] 2515." S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2195; *see United States v. Cianfrani*, 573 F.2d at 855; *United States v. Phillips*, 540 F.2d at 325; *In re Evans*, 452 F.2d 1239, 1243-44 (D.C. Cir. 1971) ("the committee report which accompanied the Act explicitly indicated the committee's expectation that § 2518(10)(a) would be read as the remedy for, and hence limitation on the `right' created by § 2515"), *cert. denied*, 408 U.S. 930 (1972).

Based on the foregoing, § 2515 cannot bear the weight appellants assign it. A police department internal affairs division's disclosure or use of information, furnished by a third party, to conduct a preliminary investigation in a non-adversarial context is not a violation of § 2515; it cannot support a civil action under the Act. Such an action must be grounded, instead, on

---

[28] The impeachment exception has not been extended to civil cases. *Williams v. Poulos*, 11 F.3d 271, 288 (1st Cir. 1993); *United States v. Wuliger*, 981 F.2d at 1506; *Anthony v. United States*, 667 F.2d at 879; *cf*. *United States v. Farese*, 611 F.2d 67, 71 (5th Cir. 1980) (although § 2515 does not apply to evidence used solely for impeachment purposes, Congress "did not intend to make an exception for sentencing hearings, bail revocation hearings, or any other proceeding in which evidence is being introduced affirmatively by the government").

violations of §§ 2511(1)(c) (disclosure) and (d) (use).[29] As noted, in such an action, the plaintiff "must demonstrate `1) the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of [the Act]'". *Williams v. Poulos*, 11 F.3d at 284 (quoting *Thompson v. Dulaney*, 970 F.2d at 749). "This demonstration includes a showing that any statutory exceptions asserted by a defendant do not, in fact, apply". *Id.* Accordingly, we turn to the exceptions claimed to be found in § 2517(1) and (2).

2.

Subsections 2511(1)(c) and (d) are qualified by the introductory phrase, "Except as otherwise specifically provided in this chapter [the Act]". 18 U.S.C. § 2511(1). In other words, although the disclosure or use of illegally intercepted communications by a person who knows or should know of the illegality of the interception is usually proscribed, it may be authorized under other provisions of the Act. And, as stated, the district court held that, in conducting the investigation, the appellees' disclosure (to other law enforcement officers) and use of the intercepted information were authorized by § 2517(1) and (2). Those subsections provide that a "law enforcement officer

---

[29] Of course, liability may lie under § 2511(1)(a) against a person who intercepted, or procured another to intercept, the communications. As noted, the appellants settled with the claimed interceptors -- the Dulworths, Barr and Grogan.

who, by any means authorized by this chapter [the Act], has obtained knowledge of the contents of" intercepted communications, may disclose or use those contents as "appropriate to the proper performance of [his] official duties".[30]

These subsections provide "for limited non-public disclosure. Disclosure by one law enforcement officer to another, and use of a communication by a law enforcement officer in the performance of his duty, are authorized if such disclosure or use is appropriate to the `proper performance of the official duties of the officer'". *United States v. Cianfrani*, 573 F.2d at 855 n.7. The statutory phrase, "appropriate to the proper performance of the [officer's] official duties" was "designed to protect the public from unnecessarily widespread dissemination of the contents of

---

[30]   The Act states in relevant part:

> (1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

> (2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

18 U.S.C. § 2517(1) and (2).

interceptions and from the wholesale use of [such] information ... by an officer ... for personal or illegal purposes". *United States v. Daniel*, 667 F.2d 783, 784 (9th Cir. 1982) (quoting *United States v. Hall*, 543 F.2d 1229, 1233 (9th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 1075 (1977)).

Vines, Walker, and Rollins are "law enforcement officers" within the meaning of §§ 2517(1) and (2) and 2510(7).[31] And, their disclosure and use of information related to them by Barr and Grogan was "appropriate to the proper performance of [their] official duties", as required by § 2517(1) and (2); appellants do not claim otherwise.[32] Rather, the dispute centers solely on whether the officers obtained the information by a "means authorized by" the Act, as also required by § 2517(1) and (2). The appellants contend that the district court created an "internal affairs" exception not sanctioned by the Act, asserting that the phrase "by any means authorized by this chapter" in § 2517(1) and

---

[31]    The Act defines "investigative or law enforcement officer" as:

> any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offenses.

18 U.S.C. § 2510(7).    It is undisputed that Vines, Walker, and Rollins fall within this definition.

[32]    The Dallas Police Department General Orders for 1988 require the Internal Affairs Division to "[e]nsure the complete and impartial investigation of all complaints against any employee of the Department".    Those Orders provide further that "[a]n investigation will be conducted into *all* allegations of criminal misconduct *regardless of the source*".    (Emphasis added.)

(2) limits disclosure and use to only information obtained through a judicially authorized wiretap.[33]

The Act ("this chapter") includes only 11 sections. The phrase "by any means authorized by this chapter" in § 2517 is not covered in the definitions section, § 2510. Section 2511 does provide for lawful intercepts without a judicial order, such as when, under certain circumstances, the interceptor is also a party to the communication, or a party to the communication has given prior consent. *See* 18 U.S.C. § 2511(2)(c) and (d). But, the Act does not address expressly someone unlawfully intercepting a communication, and then providing that information to law enforcement officers.

Because the plain wording of the Act does not address the situation at hand, we must engage in statutory construction. In so doing, we are aware from our court's past experiences, as reflected in part in note 25, *supra*, that construction of the Wiretap Act is fraught with trip wires. *See, e.g.*, **Briggs v. American Air Filter Co., Inc.**, 630 F.2d 414 (5th Cir. 1980); **Fleming v. United States**, 547 F.2d at 873 ("Our analysis of ... [§§ 2515 and 2517] makes us confident of only one conclusion: the statute is not a model of clarity"); **Simpson v. Simpson**, 490 F.2d 803 (5th Cir.), *cert. denied*, 419 U.S. 897 (1974). As hereinafter reflected, construction of § 2517(1) and (2) is no exception; we balance on a

---

[33]  Of course, the Act provides that information intercepted in specified other ways does not run afoul of its general proscription against interceptions. *See, e.g.*, § 2511(2)(c) and (d).

high wire.  The one clear, and most helpful, signal is the legislative history, quoted later.

As described, § 2517(1) and (2) concern "investigative or law enforcement officer[s] who, by any means authorized by this chapter, [have] obtained knowledge" of communications, and provide that they may disclose or use such contents as "appropriate to the proper performance of the official duties of the officer [either] making or receiving the disclosure", or using the information. Section 2517, read as a whole, runs counter to appellants' contention that the phrase "by any means authorized by this chapter [the Act]" limits disclosure and use under § 2517(1) and (2) to that information obtained either through a judicially-authorized wiretap or otherwise in accordance with the Act.

The plain wording of § 2517(3) aids in convincing us that disclosure and use under § 2517(1) and (2) of unlawfully intercepted information that is otherwise conveyed lawfully to law enforcement officers is permitted; in sum, that information disclosed or used under those subsections need not be only that which is intercepted "in accordance with" the Act:

> Any person who has received, *by any means authorized by this chapter*, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom *intercepted in accordance with the provisions of this chapter* may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.

18 U.S.C. § 2517(3) (emphasis added).  This subsection, while using the phrase "by any means authorized by this chapter" also found in § 2517(1) and (2), uses a phrase not found there:  "intercepted in accordance with the provisions of this chapter".  In other words, anyone who lawfully receives information *that was also intercepted in compliance with the Act* is allowed greater disclosure of that information than is permitted by the more narrow boundaries of § 2517(1) and (2); that person may disclose that information through testimony in designated proceedings.  And, obviously, had Congress wanted to likewise limit § 2517(1) and (2) disclosure and use to only that information "intercepted in accordance with" the Act, it knew how to say so.

Furthermore, to read § 2517(3) so that "by any means authorized by this chapter" equates with "in accordance with the provisions of this chapter", as appellants would have to do, would render the latter phrase superfluous.  Needless to say, a maxim of statutory construction precludes one part being read so as to render another superfluous.  *E.g.*, **United States v. Chen**, 913 F.2d 183, 190 (5th Cir. 1990) (quoting **Duke v. University of Texas**, 663 F.2d 522, 526 (5th Cir. 1981)) ("It is well established that a statute should be construed so that each of its provisions is given its full effect; interpretations which render parts of a statute inoperative or superfluous are to be avoided.").

The use permitted under § 2517(1) and (2) for unlawfully intercepted information that was received lawfully by an officer also seems supported by § 2517(5), which states:

When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications *in the manner authorized herein*, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that *the contents were otherwise intercepted in accordance with the provisions of this chapter*. Such application shall be made as soon as practicable.

18 U.S.C. § 2517(5) (emphasis added). Pursuant to this section, information obtained by an officer conducting an authorized wiretap, even though it is outside the boundaries specified in the authorization order, may be used for the purposes of § 2517(1) and (2), such as for an internal investigation, but may not be used for a more extensive or public purpose (testimony in the type proceeding specified in § 2517(3)), unless first authorized by a judge. This, again, demonstrates the distinction between public disclosure through testimony and disclosure or use for "the proper performance of the official duties" of a law enforcement officer, as in the investigation in this case. Much greater latitude is allowed for the source of information for the latter.

It can be argued that the exception permitted under § 2517(5) (for § 2517(1) and (2) disclosure and use of information outside that permitted by a wiretap order) is the only exception to the Act's proscribing the disclosure or use of information not obtained in accordance with the Act -- that it is the exception envisioned

by the phrase "any means authorized by this chapter" found in § 2517(1) and (2).  But, such a narrow reading of the phrase, as urged by the appellants, would permit using only the contents of interceptions made in accordance with the Act, such as through a judicially-approved wiretap or by consent under certain circumstances.  This would mean that officers receiving information about police misconduct, obtained through an illegal interception by a third party, could not use that information to investigate, and possibly prevent, the misconduct, no matter how serious, imminent, or life threatening.  This flies in the face of common sense, and would require us to read § 2517(1) and (2) in a manner that compels an absurd result.

The well established maxim against a construction that would clothe Congress with intending such a result does not permit such a reading in this instance. *See, e.g.*, ***Public Citizen v. United States Dep't of Justice***, 491 U.S. 440, 454 (1989) (brackets, internal quotation marks, and citation omitted) ("Frequently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act."); ***Ecee, Inc. v. Federal Energy Regulatory Comm'n***, 611 F.2d 554, 564 (5th Cir. 1980) (brackets, internal quotation marks, and citation omitted) ("A

construction of a statute leading to unjust or absurd consequences should be avoided").

Because of the lack of clarity in § 2517, we look to the Act's legislative history.  *E.g.*, **Toibb v. Radloff**, ___ U.S. ___, 111 S. Ct. 2197, 2200 (1991) (internal quotation marks omitted) ("Where ... the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear."); **Stone v. Caplan (Matter of Stone)**, 10 F.3d 285, 289-90 (5th Cir. 1994) (court can consider legislative history in interpreting ambiguous statute).  And, as stated earlier, that the phrase in question cannot be read as narrowly as appellants urge is covered expressly by that history:

> Neither paragraphs (1) nor (2) [of § 2517] are limited to evidence *intercepted in accordance with the provisions of the proposed chapter*, since in certain limited situations *disclosure and use of illegally intercepted communications would be appropriate* to the proper performance of the officers' duties.  For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself.

S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2188 (emphasis added); *see also* **United States v. Liddy**, 354 F. Supp. 217, 221 (D.C.D.C. 1973) (citing legislative history, and rejecting contention that absolutely no disclosure is permitted by the Act, because it would prevent persons who have allegedly violated the Act from being prosecuted; Congress did not intend for Act "to be self-emasculating"), *aff'd,* 509 F.2d 428

- 39 -

(D.C. Cir. 1974), *cert. denied,* 420 U.S. 911 (1975).[34]  No more need

be said; the facts at hand present one of the "limited situations"

forecast by the legislative history for allowing use of illegally

---

[34]  In dictum, the Second Circuit has described § 2517(1) and (2) in a manner consistent with our reading and the legislative history, focusing on whether the officers gained knowledge of the contents of the intercepted communications lawfully, rather than on whether the interception was lawful:

> Subsection 1 [of § 2517] permits "any investigative or law enforcement officer" *who has lawfully obtained knowledge of the contents of any intercepted communication* to "*disclose* such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate" in the performance of their official duties.  Subsection 2 authorizes investigative or law enforcement personnel *who have lawfully obtained knowledge of any intercepted communications* "to *use* such contents to the extent such use is appropriate to the proper performance of [their] official duties."

*Application of Newsday, Inc.*, 895 F.2d 74, 76 (2d Cir.) (emphasis added), *cert. denied*, 496 U.S. 931 (1990).  *Cf. United States v. Vest*, 813 F.2d 477 (1st Cir. 1987), discussed earlier in part II.B.1., where the court held that, pursuant to § 2515, illegally intercepted information was inadmissible as evidence, even though the government played no role in the interception.

> [A]n invasion of privacy is not over when an interception occurs, but is compounded by disclosure in court or elsewhere.  The impact of this second invasion is not lessened by the circumstance that the disclosing party (here, the government) is merely the innocent recipient of a communication illegally intercepted by the guilty interceptor.

*Id*. at 481.  *Vest* is inapposite; it did not consider or address disclosure or use authorized by § 2517(1) or (2).  Instead, as noted, it concerned § 2515 (the statutory exclusionary rule), and involved a criminal prosecution for perjury, in which the government sought to introduce in evidence a conversation recorded by a third party without the defendant's knowledge.  The court "decline[d] to read into section 2515 an exception permitting the introduction in evidence of an illegally-intercepted communication by an innocent recipient thereof".  813 F.2d at 481.

intercepted information.[35]  *See also* **United States v. Ross**, 713 F.2d 389, 392 (8th Cir. 1983) (quoting **Roberts v. United States**, 445 U.S. 552, 558 (1980)) ("the limitations Congress placed on the willful disclosure of wire communications in subsection 2511(1)(c) should not be examined in a vacuum.  As the Supreme Court has emphasized, a `deeply rooted social obligation' exists for citizens to report felonies to the authorities").[36]

We hold that, under the unique facts and circumstances of this case -- including that the appellees did not participate in or procure the interception, and obtained knowledge of the intercepted communications from third parties who made serious charges that an officer was engaged in administrative and criminal misconduct -- the appellees' disclosure and use of the information from the intercepted communications, in conducting a preliminary internal

---

[35]  *But see* James G. Carr, **The Law of Electronic Surveillance**, § 7.4(b), at 7-47 (1993) ("use of illegally obtained information should be limited to [investigation and prosecution of persons who violate the Act] and not expanded into other investigatory activities or purposes, despite the suggestion in Senate Report 1097 to the contrary").

[36]  *Cf.* **Rodgers v. Wood**, 910 F.2d 444 (7th Cir. 1990), in which police officers, executing a search warrant at a building, used the owner's telephone.  The owner taped all calls made on that telephone, including an officer's to a reporter, advising about the warrant before it was executed (a felony under Wisconsin law). After the owner's lawyer disclosed the intercepted contents to the police department's internal affairs division and others, the officers sued the lawyer, and were awarded damages.  The Seventh Circuit rejected a claim to a common law privilege for statements to police officers in the course of investigation of criminal activity.  (Needless to say, § 2517 was not in issue; the suit was not against the police.)

affairs investigation, was authorized by § 2517(1) and (2).[37]  We caution that this holding is narrow, limited to the facts of this case.  It should not be read as undermining the salutary purpose of the Act, or as providing a means of sidestepping it.

C.

The City's appeal had its genesis when, approximately two years after this action was filed, Vines, who had been terminated as Chief of Police, moved to disqualify the City Attorney as his counsel, and requested the appointment of independent counsel, to be paid by the City.  He claimed a conflict of interest because the City Attorney was involved in presenting charges which led to Vines' prosecution for misdemeanor perjury in an unrelated matter.

At a hearing on the motion, Vines stated that he had presented a claim for damages to the City, related to his discharge, and intended to file a civil action if the matter was not resolved.  The district court granted the motion, finding that the past relationship of Vines and the City Attorney's office, as it related to both the perjury charge and Vines' damages claim, constituted a sufficient basis for finding a conflict.

The City moved for reconsideration, pointing out that, subsequent to filing his disqualification motion, Vines was acquitted of perjury, and asserting that the order to pay

---

[37]  Our holding precludes reaching the appellants' state law claims, which are premised on the same facts and circumstances as their federal claims.  They requested reinstatement of the state claims only if the summary judgment on the federal claims was reversed.

attorney's fees exceeded the scope of the court's authority.  The

court denied the reconsideration motion, stating:

> The conflict arises from the City Attorney's
> attempt to represent Vines in this action while
> simultaneously taking an adverse position to that
> of Vines in a criminal proceeding, and in Vines'
> claim for damages against the City.  In such a
> situation, an attorney's loyalty to the client is
> called into question.

We review the rulings only for abuse of discretion.[38]  *See **In

re Dresser Industries, Inc.***, 972 F.2d 540, 542 n.4 (5th Cir. 1992)

(citing ***In re Gopman***, 531 F.2d 262 (5th Cir. 1976)).

The City claims first that Vines failed to establish a

conflict of interest.  At the conclusion of the hearing, the court

stated that the relationships between Vines and the City "certainly

offer the greatest potential for conflict of interest that can be

imagined", and held that disqualification was necessary "in order

to ensure that Vines receives effective and impartial

representation".  The court was well within its discretion.

The City asserts next that the district court should not have

reached the issue of attorney's fees.  We disagree.  As the

---

[38]     In July 1991, our court denied the City's petition for a writ
of mandamus concerning the disqualification order.  Although the
parties have not addressed whether that order is final, we note
that a judgment determining liability for attorney's fees, but not
awarding a specified amount of fees, is interlocutory in nature.
*See **Echols v. Parker***, 909 F.2d 795, 798 (5th Cir. 1990); ***Deloach v.
Delchamps, Inc.***, 897 F.2d 815, 826 (5th Cir. 1990); ***Hay v. City of
Irving, Tex.***, 893 F.2d 796, 800 (5th Cir. 1990).  But here, the
City is appealing the disqualification of the City Attorney; it
apparently does not contest its paying reasonable attorney's fees
if there is a conflict of interest.  In fact, it concedes that
Texas law provides a statutory basis for a municipality to employ
outside legal counsel to defend a lawsuit against an employee when
there is a conflict (or potential conflict) of interest between the
municipality and employee.

district court noted in its order denying the reconsideration motion, it did not order the City "to pay a certain fee to any particular attorney, but has only ordered that the City will be responsible for the necessary and reasonable fee". This was not an abuse of discretion.

Finally, the City contends, in the alternative, that the disqualification should apply only to the extent that Vines is sued in his individual capacity, asserting that a suit against Vines in his official capacity is a suit against the City, and that to prohibit the City Attorney from representing Vines in that capacity effectively denies the City its right to represent itself. Responding to a similar contention in its order denying reconsideration, the district court stated that "[t]he obligation to pay the fees applies to the representation of Vines in both his individual and official capacities". For obvious reasons, because the court found a conflict of interest, we do not consider this ancillary ruling an abuse of discretion.[39]

## III.

For the foregoing reasons, the judgment and the ruling on counsel for Vines are

**AFFIRMED.**

---

[39] We note that, on appeal, and contrary to the concerns expressed by the City, Vines adopted the City's brief on the merits. He briefed only the separate counsel issue.