618 So.2d 68 (1993)
Oscar RUDD
v.
MONTGOMERY ELEVATOR COMPANY.
No. 89-CA-1324.
Supreme Court of Mississippi.
February 18, 1993.
Rehearing Denied June 3, 1993.
*69 Michael J. McElhaney, Jennifer L. Smith, Colingo Williams Heidelbert Steinberger & McElhaney, Pascagoula, Scherry J. LeSieur, Bryant Clark Dukes Blakeslee Ramsay & Hammond, Gulfport, for appellant.
Cary E. Bufkin, Shell Buford Bufkin Callicutt & Perry, Eugene R. Naylor, Shell Buford Firm, Jackson, for appellee.
EN BANC.
HAWKINS, Chief Justice, for the Court:
Oscar Rudd has appealed a J.N.O.V. judgment in the circuit court of Harrison County dismissing his complaint following a jury verdict in his favor. Rudd had filed a complaint against Montgomery Elevator Company alleging negligent maintenance of the elevators in Gulfport Memorial Hospital resulting in a malfunctioning elevator which caused him personal injuries. Finding there was insufficient evidence to make a jury issue on liability, and the circuit judge was correct as a matter of law in dismissing his complaint, we affirm.

FACTS
Gulfport Memorial Hospital has three passenger elevators, S-1, S-2, and S-3. These elevators were designed, built and installed by Montgomery Elevator Company (Montgomery), a foreign corporation doing business in this State, and serviced and maintained under a contract between the hospital and Montgomery. The accident, or incident, out of which this cause of action arose was from elevator S-2.
The elevators were traction elevators, running on roller guides on steel tracks. Montgomery had weekly inspection days when it would inspect the elevators by having its mechanic check the lights, buttons, position indicators, and then go into the pit where the motor and controls were located and check out the machinery and relays, and clean out the trash. The "resistors" would also be examined. Most of the inspection would be visual and manual examination.
James Cassibry on November 10, 1986, was assistant director of engineering of the hospital. He was notified late that afternoon by a security guard that elevator S-2 was stuck on the second floor, and had been for most of the afternoon, and the guard had shut the main-breaker off. Cassibry instructed the guard to put an out-of-order sign on the first floor and shut off the power to S-2.
Robert L. Hincks was service mechanic for Montgomery in the Gulfport area. Montgomery had an answering service for customers to "call back" on any problems, following which Hincks would attend to them. Montgomery also had regular dates on which it would go to its customers' elevators and inspect and maintain them. *70 Montgomery received a "call back" relative to the elevator on the morning of November 11. It so happened that this date was a regular maintenance day for Montgomery to inspect the hospital elevators, and Hincks was already at the hospital when Montgomery got the call-back.
Hincks went to the elevator, and found it had been turned off and was out of service. He disconnected the doors and turned it on for thirty to thirty-five minutes, and found nothing out of the ordinary. He then "put the doors back in, put the wire back on the terminal," and rode the elevator up and down and found nothing wrong. He then went down in the pit and found nothing wrong. Following his inspection in which he found nothing wrong and the elevator operating satisfactorily, he put it back in operation.
Around 3:00 o'clock that afternoon, Rudd, 73 years of age at the time, was in the building visiting his wife, who was a patient on the fifth floor. He got on the elevator to go to the first floor to get his wife's hearing aid, and pressed the button. According to Rudd, the elevator descended a few inches below the fourth floor, came back up slowly about fourteen inches above the fourth floor, at which time "I heard this noise under my feet and felt some vibration and I thought I could hear something slipping," and "just all at once, that elevator fell just like a ton of brick, I would say, and it hit the floor."
Rudd called for help, and Ralph Richardson, maintenance electrician for the hospital, responded by going to the fourth floor. Richardson shut off the power source to the elevator, and told his supervisor to call Montgomery. Rudd was calling from inside and told Richardson he was the only person in the elevator. Richardson had a special elevator key, which he inserted in a hole at the top of the elevator. This tripped a latch, enabling him to open the elevator door. He found that the elevator had stopped about two feet below the fourth floor level. Rudd was standing with his hand on a rail. He assisted Rudd in stepping out of the elevator, and asked him if he was hurt. He did not recall Rudd saying anything about being injured.
Cassibry called Montgomery and reported to its answering service about the problem with the elevator. It so happened that Hincks was still in the hospital that afternoon when he learned about the problem on the fourth floor.
There are two doors to an elevator, the "hoistway door," which is the hallway door, and the inner, or "car" door attached to the elevator car. On the outer door are two rollers, one stationary, the other movable. When the car stops at a floor, a clutch on the inner door activates an attachment which causes the movable rollers on the outer hoistway door to open it, and the two doors then open together.
When Hincks arrived at the elevator, he found the hoistway door closed and the inner door halfway open. He went to the fifth floor, opened the door and got on top of the car. He thought the car had hit a roller which stopped it. However, he found the "clearance of the clutch and roller was still the same." He again went through the same procedure he had that morning. He disconnected the doors, put the elevator on inspection and rode on top of the elevator to see "whether there's anything that's in the hatch or whatever might be a problem that's making the elevator stop." He rode all the way up and down. He then went to the machine room and ran the elevator to every floor at normal speed and found no malfunction. He inspected relays and the controller. He then put the doors back in operation, and rode the elevator to each floor, but found nothing abnormal. He visually searched for any sign of abnormality or foreign objects, but found nothing wrong. He again spent some thirty to thirty-five minutes operating and inspecting the elevator.
Hincks could give no explanation for the malfunctioning of the elevator when Rudd was operating it except the possibility of some foreign object such as "pencils, screws, pens, bobby pins, paper clips, tongue suppressor" being stuck in the outer door tracks which kept it from opening. The foreign object, if any, had somehow *71 been kicked or knocked away and was never discovered.
Hincks returned to the hospital the next day, November 12, on a call that S-2 and another elevator had problems. He found a bad "P" resistor, which he replaced. Hincks then found S-2 elevator would not leave the fourth floor. He testified, "I went up and adjusted the stationery roller on the door because the car door would not close all the way. It had kept it open, because the movable part on the clutch would not release off that roller to allow it to go on and close." He testified that he had checked this roller twice the day before and found nothing wrong. Hincks testified replacing the resistor had nothing to do with the operation of S-2.
There is nothing further in the record about any malfunctioning of S-2 following November 12.
On September 14, 1987, Rudd filed a complaint against Gulfport Memorial Hospital and Montgomery in the Circuit Court of the First Judicial District of Harrison County, first alleging negligence against the hospital for failing to furnish Rudd, an invitee, reasonably safe premises, and negligence against Montgomery in its maintenance of the elevator; second, alleging strict liability in tort against Montgomery for negligent design; and third, contractual liability against Montgomery as a third party beneficiary under the contract between Montgomery and the hospital to service and maintain the elevators so they would operate with safety. The complaint concluded with a claim for punitive damages, seeking in total $250,000 compensatory, and $2,500,000 in punitive damages.
On June 19, 1988, Joe Cunningham, elevator specialist, inspected S-2, and the surrounding elevator area and took pictures.
Following extensive discovery, on June 12, 1989, Gulfport Memorial Hospital moved for summary judgment, which was sustained by a July 18, 1989, order, and the hospital was dismissed as a defendant. No appeal has been taken from the dismissal of Gulfport Memorial Hospital.
A pretrial motion in limine was filed by Montgomery on July 21, 1989, to preclude Cunningham from testifying as an expert because of Rudd's failure to properly answer Montgomery's interrogatory number one asking him to identify his expert witnesses, the subject upon which each was to testify, the substance of the facts and opinions upon which each was expected to testify, and a summary of the grounds for each opinion. Rudd had responded, naming Cunningham as his expert, and concluded his answer as follows:
Mr. Cunningham is expected to testify in regard to the maintenance, operation and defective condition of elevator No. S-2 upon the premises of Memorial Hospital at Gulfport. Said testimony will be based upon a personal inspection of said elevator and a review and evaluation of documents relative to design, installation and maintenance of said elevator.
The motion was overruled on July 27, the first day of a four-day trial.
The facts pertaining to the accident as above related were offered into evidence. Hincks testified as an adverse witness, and Cunningham as an expert on behalf of Rudd. Cunningham, a professional plaintiff's witness in lawsuits involving elevators, did not have his professional qualifications challenged on voir dire prior to his testifying before the jury. His opinions were based upon his June 19, 1988, inspection of the elevator and review of the maintenance tickets, and also testimony of Rudd, Hincks and Cassibry.
The issue of negligent design raised in the initial pleading was removed in discovery, and also by Cunningham's testimony at trial, who offered no testimony that there was any defect in either the design or installation of the elevator system, and also by his testimony that he believed Montgomery followed the safety code in its installation. The sole issue presented to the jury in this case was whether Montgomery was negligent in its maintenance of elevator S-2 which caused the malfunction in which Rudd was injured.
Cunningham was of the opinion that the elevator malfunctioned because the roller on the fourth floor was out of position, *72 which should have been obvious to an elevator mechanic, and the sudden drop could have been caused by the resistors overheating or "the switch hung up." He said that each elevator had "fifty or so" resistors. According to Cunningham, the malfunctioning could have been avoided by proper maintenance.
When Rudd rested, Montgomery moved for a directed verdict. In overruling the motion, the circuit judge noted grave reservations as to whether Cunningham was indeed an elevator expert, and also whether "he ever, in fact, expressed an opinion as to the causation and if it would have any basis, whatsoever, in the evidence." Nevertheless, he observed that because of this Court's urging trial judges to let doubtful cases go to the jury in the first instance, he would do so in this case and review the matter again upon a motion for a J.N.O.V. if there were a jury verdict for the plaintiff.
There was a jury verdict for Rudd in the amount of $250,000, following which Montgomery moved for a judgment notwithstanding the verdict. The circuit judge sustained the motion, finding first that Montgomery's motion in limine should have been sustained and Cunningham's testimony should have been excluded under Rule 37, Miss.R.Civ.P.; second, that Cunningham did not qualify as an expert under Rules 701 or 702 Miss.R.Evid. He then noted that Rule 704 gave Rudd no relief because Cunningham's opinion was a "mere conclusion of the ultimate question for the jury, i.e., negligent performance of the maintenance and was not of any assistance as to why it was negligence."
Finally, the court noted that having had the opportunity to observe the demeanor of the witnesses, the short time within which the jury reached its verdict and the amount of it, that even if he found a J.N.O.V. was not appropriate, then a new trial would have been granted both on liability and damages. While the plaintiff was injured, the amount was so excessive as to evince bias and prejudice.
Judgment was thereupon entered dismissing the complaint. Rudd has appealed.

LAW
The circuit judge's dismissal was based upon a Miss.R.Civ.P. Rule 37 discovery violation, Cunningham's failure to qualify as an elevator expert, and his testimony failed to make a jury issue on Montgomery's negligence.
Because we find that the circuit judge's ruling was manifestly correct as a matter of law in that even with Cunningham's testimony as an "expert," there was no credible evidence creating a jury issue on negligent causation, we affirm.
It needs first be noted issues that are not involved in this case. There was no issue of negligence on the part of Gulfport Memorial Hospital or res ipsa loquitur, because the hospital was dismissed upon a summary judgment from which there has been no appeal. Nor was there a products liability issue of defective design or installation by Montgomery, this having been removed both in discovery and by Cunningham's testimony.
The sole issue presented in this case is whether there was sufficient evidence presented to make a jury issue that Montgomery negligently failed to properly inspect and maintain the elevator which caused it to malfunction November 11, 1986. We find Cunningham's testimony and all reasonable inferences therefrom created no jury issue.
In the absence of some contractual guarantee that the elevator would never malfunction mechanically, obviously there is no rule of law requiring such guarantee. All things mechanical are subject to breakdown upon occasion even with the best maintenance. To make a jury issue on liability in this case, it was incumbent upon Rudd to establish by competent evidence that Montgomery was somehow negligent in its maintenance and repair of the elevator and that this negligence caused it to malfunction that day.
Cunningham testified that the cause of the malfunction was a misalignment of a roller at the fourth floor, which would have been obvious to Hincks. His sole basis for *73 this was a conjecture arising from inspecting the elevator a year and a half following the incident on November 11, 1986, and, according to him, examining the maintenance and repair tickets, and the testimony of Hincks. Hincks positively testified, however, that he did examine the rollers at the fourth floor level on November 11 following the accident, and found them to be in alignment. The elevator operated smoothly without incident for over half an hour during Hincks's inspection following the accident. It continued to operate smoothly. It is true he found a misalignment at the fourth floor level the next day when the elevator malfunctioned at the fourth floor level, which he corrected. There is nothing other than pure speculation, however, that Hincks somehow missed this the previous day. Against such conjecture was Hincks's positive testimony there was no misalignment on November 11, and the fact that the elevator continued to operate smoothly without mishap for at least another eighteen to twenty hours. Samuels v. Mladineo, 608 So.2d 1170 (Miss. 1992).
It might very well be true that Hincks somehow missed seeing a misalignment of the roller on November 11, just as it might be true that Montgomery could have rendered better maintenance and repair service which would have detected and prevented whatever it was that caused the malfunction on November 11. It was incumbent upon Rudd, however, to offer something beyond pure speculation that there was negligence of this nature and that it in fact caused the malfunction. Cunningham's testimony with all reasonable inferences based thereon, carries us no further than simple speculation.
There is simply nothing about Cunningham's testimony other than pure speculation that the one-sixteenth inch misalignment was there on November 11, and even more speculative is that somehow it would not have occurred with even the best of maintenance. It is elementary law that in any lawsuit based upon negligence, it is incumbent upon the plaintiff to first prove by a preponderance of the evidence that the defendant was negligent and that such negligence was a proximate cause of the accident. Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1354 (Miss. 1990); Phillips v. Hull, 516 So.2d 488, 491-92 (Miss. 1987); Scoggins v. Vicksburg Hospital, Inc., 229 Miss. 770, 782, 91 So.2d 837, 842 (1957).
AFFIRMED.
PRATHER, P.J., and BANKS, McRAE, and ROBERTS, JJ., concur.
PITTMAN, J., dissents with separate written Opinion joined by DAN M. LEE, P.J., and SULLIVAN, J.
SMITH, J., not participating according to Supreme Court Rules.
PITTMAN, Justice, dissenting:
I must respectfully dissent. After the jury awarded Rudd $250,000 in damages, the trial judge determined that Joe Cunningham's testimony as an elevator expert should have been excluded pursuant to M.R.C.P. 37, and that Cunningham failed to qualify as an expert. Without Cunningham's testimony, the trial judge held that Rudd failed to establish his case and entered a judgment notwithstanding the verdict (j.n.o.v.).
On October 16, 1987, Montgomery propounded interrogatories to Rudd requesting information regarding expert witnesses. Rudd responded on June 23, 1988, informing Montgomery that he intended to call Cunningham as an expert and that he was going to testify as to the maintenance, operation and defective condition of elevator No. S-2. Although Rudd addressed each portion of Montgomery's interrogatory, it was admittedly incomplete, and Rudd failed to supplement the interrogatory.
Montgomery, however, failed to file a motion to compel. In State Highway Commission of Mississippi v. Havard, 508 So.2d 1099 (Miss. 1987), this Court was faced with a similar situation. The State Highway Commission (MSHC) objected to certain testimony from an expert witness regarding five comparable sales. MSHC claims that information regarding the comparable sales were not disclosed in pre-trial discovery. In his response, Havard stated *74 that the expert would base his opinion on a series of comparable sales. MSHC made no further requests for the specifics of the comparable sales. In holding that a motion to compel was necessary to impose sanctions, this Court stated:
This matter, in the end, is controlled by Denman v. Hardy, 437 So.2d 426 (Miss. 1983). Denman considers the question of whether a prior order compelling discovery is necessary for a trial judge to properly impose sanctions such as the exclusion of testimony. Where the answer may at worst be held "evasive," the discoverying [sic] party must seek and obtain an order compelling a more detailed response as a precondition of obtaining Rule 37(b) sanctions  one of which is preclusive of use of non-disclosed evidence. 437 So.2d at 429. In the present context, it would require a violation of such an order compelling further answers before the Circuit Court would have had authority to sustain MSHC's objection.
Because MSHC did not request an order compelling discovery when the Havards gave responses it deemed unsatisfactory, Denman applies and requires affirmance.
Havard, 508 So.2d at 1104. (emphasis original). Likewise, Cunningham's testimony should not have been excluded because Montgomery failed to file a motion to compel.
The trial judge also determined that Cunningham failed to qualify as an "elevator expert."
As a general rule, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education (or a combination thereof), coupled with independence and lack of bias, may testify thereto in the form of an opinion or otherwise.
Hall v. Hilbun, 466 So.2d 856, 873-74 (Miss. 1985) (footnote omitted). The trial judge is "afforded [the] widest possible discretion" in making the determination. Palmer v. Biloxi Regional Medical Center, Inc., 564 So.2d 1346, 1357 (Miss. 1990).
At trial, Cunningham testified as to his qualifications. According to Cunningham, he went to work for Otis Elevator Company in 1946 where he worked in the drafting and engineering departments in various capacities and as a service engineer. In 1951, Cunningham was an assistant superintendent of the installation of elevators in a 36-story building. In 1956, he was promoted to service representative in the Dallas, Texas office. He was later transferred to Oklahoma City, Oklahoma, where he served in the same capacity. During this time, Cunningham was continually trained in the physical workings of elevators and how to repair and maintain them. He also taught classes on repair and maintenance for sixteen years. In 1960, Cunningham was transferred to New Orleans, Louisiana as a service representative and in 1967, he was transferred to Jackson, Mississippi, where he was responsible for the day-to-day operation of all the Otis work in the State of Mississippi. Cunningham was later promoted to local manager of the El Paso, Texas, office where he was responsible for the State of New Mexico.
Cunningham left Otis in 1972 after twenty-six years of service. He moved back to Oklahoma City where he became a building maintenance supervisor of a 22-story building. In 1978, the City of Oklahoma City asked him to be inspector for the city. Cunningham served as inspector for eight (8) years. He was responsible for reviewing all the plans and documents for the installation of new elevators so that they would meet code regulations. He inspected the elevators during construction to be sure that they did actually get installed properly, and then he performed the final testing to see if they met all the requirements. Cunningham was also responsible for more than one thousand elevators that underwent a yearly test to see that they were being properly maintained as far as the code was concerned.
In 1984, Cunningham resigned from the City of Oklahoma to become an elevator consultant for building owners, managers, *75 architects, and attorneys. Cunningham is a member of the National Association of Elevator Safety Authorities and a former member of the National Interest Review Committee of the American National Standards Institute which was responsible for formulating the code for elevator safety and for reviewing any conditions that come up that need to be reviewed by the code committee.
Cunningham stated that he had testified as an expert in the field of elevator safety and maintenance ten to twelve times in actual trial settings and approximately thirty to forty times in depositions. He has been qualified as an expert in federal courts in Georgia, Mississippi, and Alabama, and in state courts in Rhode Island, Georgia, Arkansas, Oklahoma, Kansas, Texas, New Mexico, Colorado, and Indiana.
This case involves the question of whether Montgomery was negligent in maintaining and inspecting the S-2 elevator. As is evident from his testimony, Cunningham's work has involved the servicing and maintenance of elevators since 1946. Montgomery's counsel never even brought his qualifications into question. The only objection raised at trial dealt with the incomplete response to Montgomery's interrogatories.
Upon review of his qualifications, it is clear that Cunningham was more than qualified to testify as an expert in this case. The trial judge abused his discretion in holding that Cunningham failed to qualify as an expert. Thus, the trial judge erred in determining that Cunningham's testimony should have been excluded.
The majority contends that Rudd failed to establish a jury issue with respect to negligent causation even with Cunningham's testimony. According to Cunningham, however, Montgomery failed to properly maintain S-2. Cunningham testified that Montgomery was not maintaining the proper clearance required for the roller used and, as a result, Montgomery should have adjusted the roller on a regular basis. Cunningham was of the opinion that Montgomery's failure to properly adjust the roller caused the accident in question.
The testimony presented at trial was sufficient to establish a jury issue as to Montgomery's negligence. The trial judge erred in granting the j.n.o.v. I would affirm the jury's finding of negligence. Finally, any question regarding an excessive verdict could be handled through remittitur if appropriate.
DAN M. LEE, P.J., and SULLIVAN, J., join this Opinion.