IN THE COURT OF APPEALS

8/12/97

OF THE

STATE OF MISSISSIPPI

NO. 95-CA-00437 COA

TORY FREEMAN, AN INDIVIDUAL, AND

EMPIRE GAS OF BAY SPRINGS,

MISSISSIPPI, INC. APPELLANTS

v.

HUSEMAN OIL INTERNATIONAL, INC. APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. HYDE RUST JENKINS II

COURT FROM WHICH APPEALED: ADAMS COUNTY CHANCERY COURT

ATTORNEY FOR APPELLANTS: WILLIAM R. RUFFIN

ATTORNEYS FOR APPELLEE: L. JACKSON LAZARUS

BOBBY L. COX

NATURE OF THE CASE: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

TRIAL COURT DISPOSITION: CHANCELLOR AWARDED DAMAGES TO APPELLEE

MOTION FOR REHEARING FILED: 8/25/97

PETITION FOR CERTIORARI FILED: 11/17/97

BEFORE THOMAS, P.J., DIAZ, AND PAYNE, JJ.

DIAZ, J., FOR THE COURT:

Appellee, Huseman Oil International, Inc. (Huseman) filed suit against Appellant, Tory Freeman (Freeman), an individual, and Empire Gas of Bay Springs, Mississippi in the Adams County Chancery Court. Huseman maintained that Freeman attempted to destroy Huseman's business enterprise. The Chancellor found that " [Freeman and Empire] did willfully and intentionally interfere with the business of [Huseman] and that the acts of [Freeman and Empire] were calculated to cause damage to [Huseman] and its business enterprise." Due to this finding, the Chancellor awarded $72,000 in damages to Huseman, and Freeman and Empire appeal.

FACTS

Freeman was the manager at Empire, a propane gas distributor, and oversaw the delivery of propane to Huseman's oil well sites. The business relationship had been ongoing for a period of three years. Huseman originally made his payment to Empire within thirty days, then started making them every sixty days, and finally only every ninety days or longer. Empire's payment policy was that each well should pay Empire within 45 days from date of service. Freeman informed Huseman of this policy, and Huseman replied that he could not do that. Sometime in 1993 Empire hired a new credit manager at the home office. The new manager changed the credit policy and began to require security for accounts which were greater than $5,000. Freeman informed Tom Huseman of this new policy, and Huseman stated he would call Freeman back. Eventually, Mr. Huseman informed Freeman that he was no longer doing business with her company. Subsequently, the Huseman account fell further into arrears. Another service company started servicing Huseman's wells. Freeman attempted to locate the new server by calling Cynergy and Herring Gas. Freeman learned from the person to whom she spoke, Don Cavin, that the new server was Herring Gas, and Freeman informed him of the situation between Empire and Huseman. Freeman asked Cavin for help in collecting the debt owed to Empire suggesting that Herring not service Huseman so Freeman could collect the money. Cavin did not comply with Freeman's request, but continued servicing Huseman's wells without any material delay.

Huseman alleged a loss of $700,000 to $800,000 because it was forced to sell its interest in an oil well known as USA 17-7. Huseman claims that Freeman contacted various companies which did business with Huseman and told these companies that Huseman was in financial straights. Huseman claims that the investors no longer trusted it and that Tom Huseman had to resign as well operator. Freeman denies having contacted any of Huseman's providers except for Cynergy and Herring.

In addition to Cavin, Huseman called as a witness, Scott Romines, Herring's manager of its Prentiss plant. Romines testified that Freeman called and informed him of Huseman's debt to Empire, and Freeman said that other contractors would not accept Huseman's checks. Huseman also called Jim Traxler who stated that in 1993 he was contemplating investing in one of Huseman's wells, but because of the rumors that Huseman was about to go bankrupt, he did not invest.

In addition to Freeman's own testimony that she only contacted Cynergy and Herring, Freeman and Empire called two other witnesses. These witnesses testified that Tom Huseman had previously owned a corporation which owed more that $1.7 million at its demise, and that Tom Huseman had a bad reputation in the oil field industry for repayment of debts.

The chancellor found that Freeman actively and purposely interfered with the business of Huseman and the conduct was calculated to cause damage to Huseman and its lawful business enterprise. The chancellor also found that as a result of this conduct, Huseman suffered economic loss. Mr. Huseman testified that over the next twenty years Huseman will lose anywhere from $700,000 to $800,000 on the USA 17-7 well along with $4,000 to $6,000 per month operating profit on the well. The court took note that an oil well is a fickle creature as to longevity, and to base a decision of damages on what it may do in twenty years would be speculative. However, the chancellor found that it is reasonable to assume that the well would have operated for at least one or two more years; and therefore, Huseman should be entitled to operating profits.

The chancellor further found that the acts of Freeman were without justifiable cause and that Huseman was damaged in the amount of $72,000 as a result.

ISSUE

Did the chancellor err in finding that Huseman met its burden of proof that Tory Freeman, as agent for Empire Gas of Bay Springs, Mississippi, Inc., tortiously interfered with the business relationship of Huseman Oil?

Freeman contends that because Huseman did not prove all the essential elements required for tortious interference with a business relationship, that this Court must reverse the chancellor's ruling. In *MBF Corporation v. Century Business Communications, Inc.,* 663 So. 2d 595, 598 (Miss. 1995), the Mississippi Supreme Court set out the four necessary elements which must be proved by a preponderance of the evidence to prove tortious interference with a business relationship:

(1) the acts were intentional and willful;

(2) the acts were calculated to cause damage to the plaintiffs in their lawful business;

(3) the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of the defendant (which constitutes malice);

(4) actual damage and loss resulted.

A prima facia case is shown by proving (1) a loss and (2) that defendant's conduct caused the loss.

*Id.*

This Court agrees with the chancellor, and it was admitted by Freeman, that Freeman purposely interfered with Huseman's business with Herring in her attempt to collect the debt owed to her by Huseman. However, there was no resulting loss or damage because Herring continued to make its delivery to Huseman as usual. Therefore, what was said by Freeman to Don Cavin and Scott Romines, employees of Herring, is of no consequence and will not be addressed here.

As to the remaining testimony and evidence, the chancellor found that all four necessary elements had been proven, including the fourth, actual damages. The chancellor found that Tory Freeman had intentionally interfered with current and prospective business relations between Huseman Oil and Jim Traxler, a potential investor in USA 17-7 Well, as well as between Huseman and other current investors. The chancellor found that the interference on Freeman's part was calculated to cause Huseman damage or loss and was without justifiable cause.

The damage which Huseman testified that he has previously or expects to incur is estimated by Huseman to be between $700,000 and $800,000 on the USA 17-7 Well over the next twenty years. Huseman also estimated losing operating profits between $4,000 and $6,000 per month on the well. The chancellor found that because an oil well is unpredictable at best, the twenty-year estimate is too speculative. However, the chancellor found that to assume the well would be in operation for at least another one to two years would be reasonable and found damages in favor of Huseman in the amount of $72,000. Although the chancellor did not specify in his opinion, this figure is most likely based on the high end of the estimated operating profits of $6,000 per month and for the lower end of the estimated time of only one year.

"Findings of fact made by a chancellor will not be disturbed by the Supreme Court unless they are either manifestly wrong, clearly erroneous, or unsupported by substantial credible evidence." *Mississippi State Department of Human Services v. Barnett*, 633 So. 2d 430, 434 (Miss. 1993). This is a well-established rule in Mississippi law. *Whitworth v. Kines,* 604 So. 2d 225, 228 (Miss. 1992). Although Freeman contends that we must reverse the chancellor's ruling because Huseman did not prove all the necessary elements for tortious interference with a business relationship, this Court holds that Huseman did, in fact, prove all the elements, and that Freeman failed to prove that the chancellor's ruling was manifestly wrong, clearly erroneous, or unsupported by substantial credible evidence. It has also been held repeatedly by the Mississippi Supreme Court that when their review is one of a trial court's determination of fact, then the Court will refuse to reverse a chancery court's finding if there is any substantial, credible evidence which supports the finding. *Dunaway v. Busbin,* 498 So. 2d 1218, 1221 (Miss. 1986). Therefore, if the findings of the trial court are supported by

substantial evidence, then this Court should not disturb the findings. *Johnson v. Hinds County,* 524 So.2d 947, 956 (Miss. 1988). The record in this case is adequate as to the evidence upon which the trial court based its decision with respect to the liability of Freeman. As discussed above, the damages Huseman was awarded were based on estimates given by Tom Huseman as to his monthly operating profit. These damages are not speculative, but are well-reasoned and very conservative when viewed in light of the amount of profit which may eventually be lost by Huseman.

This case was obviously a very complicated one at the trial court level. Yet, when viewed from the appellate level, this case is a relatively simple one. Huseman Oil suffered monetary damages as a result of Freeman, acting as an agent for Empire Gas, intentionally interfering with the business relations of Huseman Oil in order to cause Huseman damages without justifiable cause. We therefore affirm the chancellor's finding that Huseman Oil met its burden of proof that Tory Freeman, acting as agent for Empire Gas, tortiously interfered with the business relationship of Huseman Oil.

**THE JUDGMENT OF THE ADAMS COUNTY CHANCERY COURT AWARDING HUSEMAN OIL $72,000 IN DAMAGES IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO APPELLANTS. STATUTORY PENALTIES AND INTEREST ARE AWARDED.**

**BRIDGES, C.J., COLEMAN AND KING, JJ., CONCUR.**


**McMILLIN, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY THOMAS, P.J., PAYNE AND SOUTHWICK, JJ.**


**HERRING AND HINKEBEIN, JJ., NOT PARTICIPATING.**

IN THE COURT OF APPEALS

8/12/97

OF THE

STATE OF MISSISSIPPI


NO. 95-CA-00437 COA


TORY FREEMAN, AN INDIVIDUAL, AND

EMPIRE GAS OF BAY SPRINGS,

MISSISSIPPI, INC. APPELLANTS

v.

HUSEMAN OIL INTERNATIONAL, INC. APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

McMILLIN, P.J., DISSENTING:

I dissent. With deference to my colleagues in the majority, I am convinced that the evidence in this case is insufficient, both on the issues of liability and damages, to sustain a verdict of $72,000 or any lesser amount. I respectfully submit that a careful review of the record would reveal that fact beyond question. Huseman Oil's case for liability, detailed in Part I of this dissent, consists exclusively of unsubstantiated speculation that Freeman was spreading malicious and false rumors of Huseman Oil's credit-worthiness generally in the business community. Huseman Oil's proof of damages, detailed in Part II, is based upon the most improbable sequence of events and requires several leaps of logic that the law simply does not permit.

I.

The Question of Liability

Huseman Oil presented evidence that would, in its best light, show a failed attempt by Freeman, acting on Empire's behalf, to tortiously interfere with one of Huseman Oil's existing contractual relationships -- namely, with its new propane gas supplier, Herring Gas. Because this claim was not actionable for the very good reason that it produced no injury, Huseman Oil apparently elected to assert a claim, based solely upon speculation and conjecture, that Freeman was circulating damaging and untrue rumors about Huseman Oil's financial status in the business community at large, and that these rumors caused Huseman Oil to suffer business losses unrelated to the business arrangement between Huseman Oil and Herring Gas.

The evidence in this record will not support such a claim. There is no evidence that Freeman ever made any disparaging remark concerning Huseman Oil's business practices to anyone other than Tom Huseman and two representatives of Herring Gas. There is no evidence that either of the Herring Gas representatives passed along any of Freeman's disparaging remarks to any other person in the business community, though both of them testified for Huseman Oil at trial, and could have been interrogated on the point. Thus, the idea that rumors of Huseman Oil's poor credit-worthiness alleged to be rampant in the business community can be traced to the efforts of Freeman must be based upon nothing but rank speculation. No judgment so based can be sustained. *Rudd v. Montgomery Elevator Co.,* 618 So. 2d 68, 72-73 (Miss. 1993).

It must be remembered that interfering with a specific contractual relationship and attempting to generally injure an entity's business reputation are separate and distinct torts. *MBF Corp. v. Century Bus. Communications,* 663 So. 2d 595, 598 (Miss. 1995). Huseman Oil may have proved all of the elements of one tort (an effort to disrupt Huseman Oil's relationship with Herring Gas) -- except for the critical failure to show any injury. Nevertheless, Huseman Oil failed, as a matter of law, in its effort to refashion the defendants' conduct into the second, more general, tort.

The burden of proving each and every fact necessary to recover rests with the plaintiff. *Town of Ackerman v. Choctaw County*, 157 Miss. 594, 128 So. 757, 758 (1930). Merely advancing a hypothetical scenario based on plaintiff's belief as to defendant's conduct is not enough to sustain a verdict of liability, yet that is essentially all that exists in this case. When the record is searched for testimony to support the conclusory assertions made in Huseman Oil's brief on appeal, such evidence is found to be painfully lacking.

Tom Huseman, in his direct testimony, is the only witness to allege that Freeman spread disparaging remarks about his company to anyone other than Herring Gas representatives. The extent of his testimony on that subject was that:

[s]he told me that she had talked to Blossman, that she, this is another propane dealer, that she had called them and talked to them because I was bouncing checks and I wasn't going to do business with anyone, that she had fixed it to where I could not buy gas and at that point I told her that I had talked with Don Cavin with Herring Gas and they would be setting the tanks today.

No representative for Blossman Gas testified to receiving a telephone call from Freeman, much less as to what the contents of such a telephone conversation might have been. Without more proof than that, I find this statement, standing alone, insufficient to support an allegation that Freeman was starting false rumors about Huseman Oil in the general business community in an attempt to injure Huseman Oil's business.

It is suggested as fact by Huseman Oil that Freeman was spreading word that it had given one or more bad checks to T. K. Stanley Trucking Company. Not one person testified at trial to this fact. The record shows that Huseman, when describing his discussion on the telephone with Freeman, claims that Freeman said, "Well, T. K. Stanley will not take your checks. You're bouncing checks on him." Accepting this statement as true, as we must on appeal, it proves only that Freeman made such an accusation to Huseman. There is no legal principle of which I am aware that would permit a fact-

finder to infer from this testimony that Freeman was making similar allegations to Huseman's existing or potential customers and suppliers. Any such conclusion could be based on nothing beyond conjecture.

Huseman also claims that, in that same exchange, Freeman told him, "Well, you're going bankrupt." Again, accepting Huseman's testimony as true, one cannot reasonably infer that Freeman ever made a similar statement to anyone else in an effort to harm Huseman's business efforts. Such accusations, in the same manner as defamation, must be published in order to do injury. Accusations, even though false, are not actionable under the theory of defamation when made solely to disparaged individual or entity.

No other witness, other than two Herring Gas representatives, testified to having heard such statements made by Freeman or any other agent of Empire Gas. Freeman herself, called as an adverse witness, said she made telephone calls to two competing butane suppliers in an attempt to persuade them to assist her in collecting the account Huseman Oil owed Empire. One call was to Synergy Gas. Her testimony is unrebutted that once she determined that Synergy was not the company making a delivery to Huseman Oil's well, she terminated the conversation. The other calls she made were to two employees of Herring Gas. Since both of these persons testified for Huseman Oil concerning the conversations, we may examine their testimony in search of support for Huseman Oil's theory of the case.

Don Cavin, operations manager for Herring Gas, testified that Freeman called him shortly after he picked up Huseman Oil's business and, putting it in its worst light for the defendants, made disparaging remarks concerning Huseman Oil's credit-worthiness and threats to Herring Gas in an attempt to persuade Herring Gas not to supply propane to Huseman until satisfactory arrangements were made to retire the Empire account.

This evidence certainly was sufficient to create a question of fact as to whether Freeman was attempting to tortiously interfere with the newly-created, but definitely existing, business relation between Huseman Oil and Herring Gas. *See* W. Page Keeton et. al., Prosser and Keeton On The Law of Torts § 129 (5th ed. 1984). The self-evident problem with this, of course, is the fact that the alleged plan failed miserably. A tort of this nature, in order to be actionable, must produce actual damages. The testimony is undisputed that, though Cavin hesitated briefly as a result of Freeman's call, Herring Gas took on the Huseman Oil account without any alteration in terms, and that Huseman Oil enjoyed, up until the day of trial, an on-going relation with Herring Gas that permitted Huseman Oil to pay its account ninety days after initial invoice -- the terms which Huseman and Cavin both testified were customary in the business.

There is no evidence in the record to suggest that Cavin passed on any information derived from his conversations with Freeman to anyone else in the business community. Huseman Oil's counsel, having the burden of showing that negative rumors about Huseman Oil were traceable to Freeman's efforts, could certainly have asked that question of Cavin. He did not, and the failure of proof on that point must weigh against the plaintiff.

Scott Romines, another Herring Gas employee, testified for Huseman Oil. His testimony, taken in the light most favorable to Huseman Oil, appeared in the following answer early in his testimony:

Yes, sir. I got a telephone call not long after we had done some work in the oilfield over there setting some propane tanks and it was a lady and she was telling me about, she was making references to Huseman owed them a lot of money and was wondering if I was aware of it and that type thing and she made reference also to I believe, it has been a while back so I can't remember details exactly but to the best of my ability it was references about other oilfield contractors that would only do work for him on a cash basis.

When asked, "What, if anything else, did she tell you?" Romines responded, "That was basically it. I told my, you know, gave her the number to my boss [Cavin] after that." Again, there is no evidence to suggest that Romines ever relayed any damaging information to anyone else in the relevant business community as a result of this telephone call.

Carl Eichelberger, an employee of Huseman Oil, only testified to the fact that at one point, apparently during the period of the transition from Empire Gas to Herring Gas as Huseman Oil's supplier, he was unable to order propane from Empire Gas. This testimony had absolutely no relevance to the issue being tried.

Jim Traxler, the plaintiff's final witness, had never met, spoken with, or even heard of Freeman. He testified to shying away from a deal with Huseman Oil "[b]ecause in my calling on people over there I kept hearing that Tom Huseman was going bankrupt." He also claimed that "I heard that Tom couldn't run his wells because he didn't have gas to run them with." The Huseman Oil failed to establish the source of such information or even the time-frame when Traxler was hearing these rumors. For all the record reveals, the rumors coming to Traxler's attention could have predated the problems that arose between Empire Gas and Huseman Oil. Since Huseman Oil has the burden, I submit that, as a matter of law, Traxler's testimony was insufficient to permit a reasonable inference that the rumors he claimed to have heard were traceable to Freeman.

II.

Damages

The problem with this judgment runs even deeper when the basis for calculating damages is examined. The entire calculation of damages is based upon Huseman's testimony that the company's poor reputation, attributable to Freeman's false rumors, was the proximate cause of the company having to sell out of a profitable drilling operation referred to as the USA 17-7 well. The proof on the point is abysmally deficient.

Huseman's version of the facts that led to his company's departure as the operator and part owner of the production of USA 17-7 can be summarized as follows: Over one year after Huseman Oil changed propane suppliers from Empire Gas to Herring Gas, Huseman Oil's geologist attempted to place a telephone order with another business for a load of "KCL water," necessary for a cleaning

procedure and costing approximately $300. The geologist (who did not testify) was, according to Huseman, told by the supplier (who also did not testify) that the water would have to be paid for in cash on delivery rather than charged. There is no evidence that any explanation for this requirement was either offered by the seller or demanded by the geologist. This telephone conversation happened to take place in the presence of Huseman and one or more of the well co-owners (none of whom testified). Six or seven days later, solely as the result of this incident, the investors in the well called Huseman and told him that he would no longer be permitted to be the sole signatory on checks for the operation. Also, allegedly because of this incident, the investors "started wanting to talk about removing me [Huseman] as operator . . . ." Somehow, in a way Huseman does not explain, the situation deteriorated until Huseman Oil wound up selling its interest in the well to the other investors and withdrawing as well operator.

There is no evidence that Huseman Oil was forced into this transaction. There is no evidence that financial necessity caused by losses attributable to Freeman's gossip drove Huseman Oil to a forced sale on unfavorable terms. Not one of the co-investors was called as a witness by Huseman to explain the cause of their sudden dissatisfaction with his performance. No contract of sale was offered into evidence by which the chancellor could determine the price obtained by Huseman Oil in the transaction. Yet, it is the claim of lost profits that Huseman Oil expected to derive from its continued participation in USA 17-7 that form the sole basis for calculating damages.

In order to sustain this verdict, it would be necessary to conclude, without any foundational proof, that Huseman Oil's KCL water supplier denied a $300 credit sale on the basis of rumors of Huseman Oil's impending demise started by Freeman over a year earlier. Next, it would be necessary to conclude that this supplier's unwillingness to extend a $300 credit to Huseman Oil was the proximate cause of Huseman's co-investors losing confidence in his abilities to operate USA 17-7 in an acceptable manner, which inexorably led to Huseman Oil's being involuntarily forced out of the well operation. This tortured analysis, unsupported by *any* proof, cannot, by any definition, be sufficient to sustain a damage award in this case.

There is yet another problem with the proof on damages. As previously noted, there was no proof as to what consideration Huseman Oil was getting for selling its participation in the well. In the last analysis, if all else in this case were in order (which it is not), there can be no doubt that, in computing the claimed loss for being forced to sell out of a profitable operation, the proven lost profits from the operation must be diminished by the consideration received for the transfer. Any calculation of damage that does not account for this is fundamentally erroneous.

III.

Conclusion

The case for liability in this proceeding is built on a foundation of the flimsiest of facts, bolstered only by unfounded hypothesis and speculative conclusions. The nexus between any of Freeman's wrongful acts and Huseman Oil's loss of its participation in USA 17-7 is not just tenuous, it is non-existent.

No alternate theory of damages presents itself on this evidence. Traxler's testimony that he declined to enter into a trade of well pipe for an interest in another Huseman well project was not accompanied by any evidence showing that Huseman Oil lost money as a result of the failure of this trade. For all the record reveals, Huseman made other suitable arrangements for the necessary pipe and Traxler, not Huseman Oil, was the loser for the failure of this deal to come to fruition.

The natural tendency to find Freeman's overly-zealous collection attempts worthy of condemnation does not permit the chancellor to punish her and her employer for that conduct through

the imposition of an award of damages unsupported by any credible evidence. This case should, without doubt, be reversed and rendered.

**THOMAS, P.J., PAYNE AND SOUTHWICK, JJ., JOIN THIS DISSENT.**