**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**Nos. 98-60396 & 98-60530**

_____

**HOWARD DALE WOODS; GENEVA WOODS,**

**Plaintiffs-Appellants,**

**versus**

**CHARLES RAMSEY; BAY TECHNICAL ASSOCIATES, INC.,**
**a Mississippi Corporation,**

**Defendants-Appellees.**

**Appeals from the United States District Court**
**for the Southern District of Mississippi**
**(1:96-CV-562-GR)**

October 13, 1999

Before DUHÉ, BARKSDALE, and EMILIO M. GARZA, Circuit Judges.

PER CURIAM:[*]

The linchpin for this diversity action is whether an unsecured rope grasped by Howard Dale Woods when he slipped descending a scaffold ladder was a proximate contributing cause of his resulting injury when he fell. Woods contests the summary judgments awarded Charles Ramsey and Bay Technical Associates, Inc., against his negligence and other claims; Geneva Woods, the judgment against her loss of consortium claim. Because Woods did not produce sufficient evidence to create a material fact issue on causation, we **AFFIRM**.

I.

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

In October 1993, Woods, a painter employed by a subcontractor on a construction job for Ramsey's home in Mississippi, fell approximately 20 feet to the ground while descending a scaffold ladder. The subcontractor was employed by a general contractor separate from Ramsey and Bay Technical.

Woods obtained workers' compensation. For this third-party action, he alleged that he missed a step while making the descent; that, when he did so, he grasped a rope hanging near the ladder; and that, because the rope was not secured, he fell and was injured. Woods claimed, *inter alia*, that Ramsey, as homeowner, and Ramsey's closely-held corporation, Bay Technical, which owned and erected the scaffold, had a duty to provide him with a safe workplace; and that their failure to do so caused his injury.

Both defendants moved for summary judgment, supported, *inter alia*, by the deposition testimony of Woods' expert, Michael Frenzel, who testified (1) that the scaffold's construction did *not* cause Woods' injury; and (2) that he could *not* say with reasonable probability that Woods' injuries would have been different had the rope, used by various workers as a materials hoist (he admitted this was *not* uncommon), been secured. In response, as well as in support of his cross-motion for summary judgment, Woods submitted, *inter alia*, 40 exhibits, including 16 depositions.

Holding that neither Ramsey nor Bay Technical owed a duty to Woods, the court granted summary judgment to each. For Ramsey, it ruled that he "did not control the work at his residence", and therefore, could not incur liability as a homeowner; for Bay

2

Technical, that, as "merely the owner and supplier of the scaffolding", it had no "duty to warn Woods of any possible danger in using" it.

## II.

A summary judgment, reviewed *de novo*, *e.g.*, **Tolson v. Avondale Indus., Inc.**, 141 F.3d 604, 608 (5th Cir. 1998), is appropriate when the summary judgment record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". FED. R. CIV. P. 56(c); *e.g.,* **Little v. Liquid Air Corp.**, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the movant shows there is no material fact issue, the nonmovant must "set forth specific facts" as to each element of his claim, "showing that there is a genuine issue for trial". FED. R. CIV. P. 56(e); *e.g.*, **Little**, 37 F.3d at 1075 (citing **Celotex Corp. v. Catrett**, 477 U.S. 317, 325 (1986)). Facts, and reasonable inferences from them, are viewed in the light most favorable to the nonmovant. *E.g.*, **Coleman v. Houston Indep. Sch. Dist.**, 113 F.3d 528, 533 (5th Cir. 1997).

Of course, we may affirm a summary judgment on any ground raised in district court. *E.g.*, **Andrus v. AgrEvo USA Co.**, 178 F.3d 395, 398 (5th Cir. 1999); **Johnson v. Sawyer**, 120 F.3d 1307, 1316 (5th 1997). Although *not* addressed by the district court, causation was one of several issues raised there (and here).

## A.

To succeed under Mississippi law on a negligence claim, Woods must prove (1) Ramsey and/or Bay Technical owed him a duty; "(2)

3

**breach** of that duty; (3) **damages**; and (4) a causal connection between the breach and the damages, such that the breach is the **proximate cause** of the damages". (Emphasis in original.) *Grisham v. John Q. Long V.F.W. Post*, 519 So. 2d 413, 416 (Miss. 1988) (citing *Burnham v. Tabb*, 508 So. 2d 1072 (Miss. 1987)). Proximate cause "is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury, and without which the result would not have occurred". *Id.* at 417 (citing *Thompson v. Mississippi Cent. R. Co.*, 166 So. 353 (Miss. 1936)). *See also* *Rudd v. Montgomery Elevator Co.*, 618 So. 2d 68, 73 (Miss. 1993) (citing, *inter alia, Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1354 (Miss. 1990) ("elementary" that negligence must be "a proximate cause of the accident").

As discussed, causation being one of the summary judgment issues presented, Woods "had the burden of presenting evidence sufficient to demonstrate the existence of a material fact issue" on that point. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994); FED. R. CIV. P. 56(e); *Little*, 37 F.3d at 1075. In so doing, he was required to explain how "*specific evidence* in the record" supported his claim. *Forsyth*, 19 F.3d at 1537 (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992) (emphasis added)). It is neither the duty of the district court, *nor this court*, to "sift through the record in search of evidence to support a party's opposition to summary judgment". *Id.* (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 & n.7 (5th Cir. 1992)).

4

Besides failing for the most part to cite specific evidence (Woods, instead, usually cites to an entire deposition), Woods' contentions on appeal regarding causation are inconsistent — to say the least.   In his brief, he cites ten violations of the scaffolding manufacturer's safety regulations manual, lists the rope as an "obstruction", and maintains that these violations had a "direct causal relation to the accident".   Yet, at oral argument, he conceded that *neither* the construction of the scaffold *nor* the claimed obstruction of the ladder caused him to fall.

Regarding causation, the summary judgment record is sparse indeed.   (As shown *infra*, this, in large part, is due to continuous improper interruptions and coaching of witnesses by Woods' counsel, especially during Woods' deposition.)   To show causation, Woods' response, in part, to the summary judgment motion was that the rope was "unsecured" and "dangling down the vertical ladder way" of the scaffold; but, he does *not* create a material fact issue concerning causation — how the rope was the proximate cause, or a proximate contributing cause, of his injury.

No one observed the accident.   In his deposition, Woods testified that, at "quitting time", as he began descending the ladder, the rope was "on the side of me"; that his "foot slipped" on the ladder; that he "lost [his] footing"; and that he could not "remember" whether it "was ... one foot or both feet at first". This extremely critical examination by Ramsey's counsel, soon and often improperly interrupted, as usual, by Woods' counsel, continued as follows:

5

Q. All right. The ladder on the scaffolding is straight up and down, isn't it?

A. Right.

Q. So you are climbing down using two hands and two feet, right?

A. Right.

Q. And you lost footing?

A. Right.

Q. Do you remember whether you were stepping down a step and lost footing, or whether your feet were on one rung?

A. Stepping down.

Q. *So you lost your footing as you were putting one of your feet down to the next rung down, right*?

A. *Right.*

Q. Did that foot slip off the scaffolding?

A. Right.

Q. *So at that point, it is one foot that slipped*?

A. *Right.*

Q. *And you are still hanging on with the other foot and the two hands*?

A. I don't understand what you are talking about.

MR. BOONE [Ramsey's counsel]: Please, Derek [Wyatt, Woods' counsel]. Let him tell me the story.

MR. WYATT: Wait just a second, Walter [Boone]. If the witness tells you, I don't understand, and you have been deposing this man for a couple of hours, you have an idea of what his capacity of understanding is. That's unfair. You are badgering him, and you are

asking him really, *really technical questions* about which hand, which foot, at what point, how many steps for an event that happened four years ago.

MR. BOONE: That's going to *the key issue to this case*, Derek, and I'm tired of you --

MR. WYATT: Key or not. I'll tell you what it won't be the key about, that there was a rope, it wasn't tied, and he fell 20 feet onto a concrete surface. If you can dispute that, let's go to a motion hearing right now because you can't. So all of this stuff that's designed to get him to say, it was my left foot and later you are going to say it was his right, and all that, is not going to amount to anything. But if he tells you, I don't understand, in fairness to him, you have a duty to explain to him what you are asking him, and he just told you that. He said, I don't understand, and I don't think he does either.

BY MR. BOONE:

Q. I will be happy to find out exactly what you do understand and what you don't. All I want to know today is what you recall, and what you are willing to testify as to the truth because it's very important.

A. Okay.

(OFF THE RECORD.)

BY MR. BOONE:

Q. Mr. Woods, I want to back up just a minute so that I can understand exactly where you were and what you were doing when you were coming down the scaffolding.

A. Okay.

Q. As I understand it, each end of each individual scaffolding had a ladder coming down it, right?

A. That I know of, yes.

7

Q.    But certainly the one that you were coming down had a ladder coming all the way down the middle, right?

A.    Yes, sir.

Q.    And this ladder wasn't on the end of the scaffolding, it's where two scaffoldings were put together, right?

A.    Right.

Q.    So what you had, as you were coming down, you looked through the ladder -- there was a ladder just a short distance away from the other piece of scaffolding; it that right?

A.    Right.

Q.    And you were telling me that at the moment that your foot slipped, you were stepping down one rung, right?

A.    Right.

Q.    Do you remember which foot it was that slipped?

A.    No, sir.  I don't remember.

Q.    But at that point, you had two hands on the ladder, and one foot, and then one foot slipped off, right?

A.    I don't remember which foot.

Q.    *But one of them did; is that fair to say*?

A.    *I don't know, sir.*

Q.    *At what point did you grab the rope*?

A.    *When I was about to fall.*

Q.    *Before you grabbed the rope, had your other foot slipped*?

A.    *It could have, sir.  I don't remember.*

8

Q.   *Do you know whether either of your hands had slipped off?*

A.   *I don't remember that neither, sir.*

Q.   Tell me -- as you are sitting there, picture in your mind, you are there with two hands on the scaffolding, right?

A.   Uh-huh (yes).

Q.   And the moment your foot slipped, were they on the same rung, or on different rungs?

A.   *When I was coming down, and before I grabbed that rope, I was getting ready to go down on another level, and my hands was, like, getting ready to reach for the other level, and then my foot slipped, and I grabbed the rope.*

Q.   Okay.  Tell me what you mean by another level.

A.   The next level on the scaffolding.

MR. WYATT [Woods' counsel]:   Do you see this picture of the scaffold?  Of the end of the scaffold?

THE WITNESS:   Uh-huh (yes).

MR. WYATT:      Does that look familiar to you?

THE WITNESS:   Uh-huh (yes).

MR. WYATT:      This is the ladder on this side, isn't it?

THE WITNESS:   Yes, sir.

MR. WYATT:      I'm just adding.  Maybe this will assist in this.

BY MR. BOONE:
Q.   Is this what you are talking about one level?

9

MR. WYATT:    Would you ask that question, please?  What was your question to him?

BY MR. BOONE:

Q.   Is this a picture of what you are talking about of one level?

MR. WYATT:    I thought your question was a minute ago -- what was your question before that you asked him?

MR. BOONE:    I don't remember.

BY MR. BOONE:

Q.   But I'm asking you now: Is this a picture of one level?

A.   Part of it.

Q.   About half of one level, right?

A.   A piece of it, yes.

Q.   So you are testifying that you were coming down to a new level?

A.   Yes, sir.

Q.   When your foot slipped?

A.   Yes, sir.

Q.   *Were you all stretched out, or were you crunched over?*

A.   *I don't remember, sir.*

Q.   *Do you remember whether your hands were on the same level, or a different level?*

A.   *No, sir.*

Q.   Where was the rope in relation to where you were?

A.   The rope was right in front of me.

Q.   Was it through the steps?

10

A.   It was on the same side I was on.

Q.   *So the rope was hanging on your side of the steps?*

A.   *Right.*

Q.   *Was it hanging on the right side of you, or the left side of you?*

A.   *I don't remember that.*

Q.   *Do you know which hand you grabbed it with?*

A.   *My left hand, I believe, sir.  I don't remember.*

MR. BOONE [Ramsey's counsel]:  He's telling me what he remembers.

MR. WYATT [Woods' counsel]: I understand. Was the answer: "The left hand, I believe, sir.  I don't remember."  Was that the answer?

MR. BOONE:  I object to coaching the witness.

MR. WYATT:  I'm asking Ms. Court Reporter if she could please tell me was that the answer.

(Answer read.)

BY MR. BOONE:

Q.   Do you understand my question?  I'm asking you which hand you grabbed the rope with.

A.   Yes, sir.

Q.   Do you remember which hand you grabbed the rope with?

A.   No, sir.

Q.   *What did you mean when you were testifying about your left hand?*

A.   *It could have been my left hand, or both hands, sir.  I don't remember.*

11

Q. Could it have been your right hand that you grabbed it with?

A. Like I said, sir, I don't remember what hand it was.

Q. *How far away was the rope from you*?

A. *I don't remember how far neither, sir.*

Q. *Presumably, it was within your reach, though, right*?

A. *Possibly, sir.*

Q. What do you remember next after you grabbed the rope?

A. When I grabbed the rope? I remember for a split second that I looked up and I thought the rope was secured, and it wasn't, and I went down.

Q. Did you see what was happening at the top of the rope?

A. Just like a flash.

Q. What did you see?

A. I seen the rope come untwirled.

Q. Was it wrapped around a bar?

A. Sir, I can't tell you that. I don't know. All I can remember, like I said, that it come unraveled, and I went down as quick as possible. I don't remember.

Q. Is that same stairway that you went down the same one that you used to go up?

A. No, sir.

Q. You used a different one?

A. Yes, sir.

Q. Why did you come down on that one that you came down on?

12

A.    Like I said, sir, when you go up and down the scaffolding, there's different places you can do down, and I don't know why I went down that side, sir.

Q.    How far up were you when you fell?

A.    I don't know how far. I don't know, sir, how far it was. It could have been 20 feet or more.

(Emphasis added.)

No summarization of this testimony can do justice to showing the inadequate record to preclude summary judgment, caused in considerable part by the improper tactics of Woods' counsel. This line of questioning by Ramsey's counsel resumed at the end of Woods' deposition:

Q.    Would you character yourself as pretty strong?

A.    Yes, sir.

Q.    When you were coming down the ladder, did you have a pretty good grip on the bars?

A.    On the bars?

Q.    As you were coming down the ladder.

A.    *It's possible, sir.*

Q.    It's possible that you had a good grip?

A.    Yes, sir.

Q.    *When your foot slipped, do you remember you telling me both of your arms were still on there?*

A.    *Yes, sir.*

Q.    *Probably at that time, you had a pretty good grip on there, didn't you?*

13

A.    *Yes, sir.*

Q.    *And a man of your strength wanted to grab on the rope as opposed to hanging onto the bars*?

A.    *I don't know, sir.*

Q.    *If you hadn't grabbed the rope, you would be okay today, wouldn't you*?

MR. WYATT [Woods' counsel]:    That's a speculative question.  Go ahead and answer, if you know.

A.    I don't know, sir.

MR. BOONE [Ramsey's counsel]: No further questions.

(Emphasis added.)

Concerning causation these are the operative facts in the summary judgment record.  As discussed, they are viewed in the light most favorable to Woods, the nonmovant; but, that cannot alter his being required, as also discussed, to identify *specific facts* creating a material fact issue.  For example, as emphasized *supra*, Woods could *not* state positively that the rope was within his reach, or why it was even necessary to grasp it when his foot slipped.  The testimony by his expert, Frenzel, bears on this question.

Frenzel, *on whom Ramsey and Bay Technical also rely*, testified that the rope "possibly" could have prevented Woods' fall:

Q:    If the rope had been tied, would that have prevented Mr. Woods' fall in your opinion?

A:    It *possibly* could have prevented Mr. Woods' fall or it *may* have arrested the fall. It *may* have lessened the significance of the fall.

14

Q: In what way would it have lessened the significance of the fall?

A: It *may* have reduced the energy at impact or it *may* have changed the angles of impact. In other words, if the rope had been secured and Mr. Woods grabbed hold of the rope, he *may* have hit on his feet with brush burns on his hands.

He was a big fellow with lots of upper body strength. He *may* have been able to stop. But even if he had not stopped it *may* have caused him to land in a more erect position which would have minimized the injury or the impact.

....

Q: And it's possible it could have been at a worse angle, you just don't know?

A: *I guess that's possible*.

....

Q: Is it *speculative* to say what would have happened had the rope been tied with regard to the extent of his injury?

A: *To some degree that's correct*.... But to say that it would lessen the injury or alter the fall, *I think I can say that*. To be able to prove or to offer medical testimony that would support that, I cannot.

Q: So it would be fair to say that you *can't state to a reasonable probability* that his injuries would have been lessened had the rope been tied off?

A: *I cannot say that with medical certainty, that's correct*.

(Emphasis added.)

Again, no one observed the accident. The foregoing evidence provided by the expert's testimony, especially when linked to that provided (or, more accurately, *not* provided) in Woods' deposition,

15

is plainly insufficient to overcome a summary judgment motion. *See, e.g.,* **Marshall v. East Carroll Parish Hosp.**, 134 F.3d 319, 324 (5th Cir. 1998) ("conclusory, unsupported statements" are insufficient summary judgment evidence).  In sum, Woods has failed to show a "reasonable connection between" the rope and his injury. *See* **Burnham**, 508 So. 2d at 1074; *see also* **Herrington v. Leaf River Forest Prods., Inc.**, 733 So. 2d 774, 779 (Miss. 1999) (quoting **Kramer Serv., Inc. v. Wilkins**, 186 So. 625, 627 (Miss. 1939) (coexistence of "negligence of one person and injury to another" is *not* enough to show causation); **Mississippi Valley Gas Co. v. Estate of Walker**, 725 So. 2d 139, 145-46 (Miss. 1998) (defendant's negligence may *not* be inferred as proximate cause unless plaintiff has eliminated other probable causes).

B.

As detailed in the district court's two opinions granting summary judgment to each defendant, it was also proper for the other claims.

1.

Ramsey's and Bay Technical's failure to comply with various safety standards is equated with negligence *per se*.  But, Woods has *not* shown a connection between the alleged violations and his injury.  *See* **Snapp v. Harrison**, 699 So. 2d 567, 571 (Miss. 1997) (for negligence *per se*, plaintiff must show (1) membership in class protected by statute, (2) injury of type sought to be prevented, and (3) violation of statute proximately caused injury).

2.

16

Woods presented a strict liability and several breach of warranty claims. But, he did *not* produce evidence that either defendant (1) manufactured or sold the scaffolding (he admits they did *not* do so), or (2) made an express warranty. *See, e.g.,* ***Scordino v. Hopeman Bros., Inc.***, 662 So. 2d 640, 643 (Miss. 1995) (seller must be more than "occasional seller" of product); ***Hargett v. Midas Int'l Corp.***, 508 So. 2d 663, 664 (Miss. 1987) (implied warranty of merchantability applies where seller is "merchant" with respect to goods sold). And, he conceded at oral argument that the scaffold did *not* cause his injury. *See* ***Scordino***, 662 So. 2d at 642-43 (for strict liability, plaintiff must prove "injury resulted from" product defect).

### 3.

Obviously, in that summary judgment was proper against Woods' negligence claim, that for gross negligence cannot survive. *See* ***West Cash & Carry Bldg. Materials of McComb, Inc. v. Palumbo***, 371 So. 2d 873, 877 (Miss. 1979) (gross negligence requires showing reckless indifference) (quoting ***Teche Lines, Inc. v. Pope***, 166 So. 539, 540 (Miss. 1936)).

### 4.

Finally, because Geneva Woods' loss of consortium claim is derivative of her husband's, *see* ***Alldread v. Bailey***, 626 So. 2d 99, 101 (Miss. 1993), her claim fails as well.

### III.

For the foregoing reasons, the judgments are

***AFFIRMED.***

17